IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,911

STATE OF KANSAS,
*Appellee*,

v.

WILLIE E. MORRIS,
*Appellant*.

SYLLABUS BY THE COURT

1.

A defendant is entitled to a voluntary intoxication instruction when the evidence, viewed in the light most favorable to the defendant, shows the defendant was intoxicated to a degree that he or she could not form the necessary intent.

2.

Evidence showing only that a defendant consumed alcohol or drugs, or that the defendant was high or intoxicated at the time of the crime, does not support an inference that the defendant was so intoxicated that he or she could not form the necessary intent.

3.

K.S.A. 60-404 generally precludes an appellate court from reviewing an evidentiary challenge absent a timely and specific objection made on the record.

4.

In a criminal case, the State has the burden to prove all the elements of the crime charged. Photographs used to prove the elements of the crime, including the manner of death and violent nature of the crime, are relevant and admissible.

5.

Cumulative evidence is evidence of the same kind to the same point. Whether evidence is cumulative should be determined from its kind and character, instead of its effect.

6.

In a cumulative error analysis, an appellate court considers all errors collectively and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect on the trial's outcome is such that they cannot be deemed harmless.

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed May 15, 2020. Affirmed.

*Kristen B. Patty,* of Kansas Appellate Defender Office, was on the brief for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Willie Earl Morris was one of several codefendants involved in the kidnapping and murder of Scott Goodpaster Jr., after a drug deal gone awry. A jury

convicted Morris of both first-degree premeditated murder and the alternative charge of first-degree felony murder, aggravated kidnapping, aggravated battery, and conspiracy to commit distribution of a controlled substance. Morris appeals his convictions alleging three trial errors: (1) the district court erred in denying his request for a jury instruction on voluntary intoxication; (2) the court erred in admitting gruesome photographs of Goodpaster's body; and (3) cumulative error denied him a fair trial. We find no error and affirm Morris' convictions.

FACTS

Morris, Goodpaster, Brian Bussart, Heidi Hillard, and Heidi's husband, Jeff Hillard, all became acquainted through using and dealing methamphetamine. Shortly before Goodpaster's murder, Heidi had given Goodpaster $600 to buy an ounce of methamphetamine. Heidi was arrested and jailed before the deal was completed. After bonding out of jail, she wanted either her money or the methamphetamine from Goodpaster. She did not receive either.

Despite the tension that arose as result of the previous failed drug buy, the Hillards arranged another deal with Goodpaster and his girlfriend, Samantha Sperber. On the morning of Saturday, November 5, 2016, the Hillards gave Goodpaster about $180. Bussart then dropped Goodpaster off at a hotel. Goodpaster used some of the money to rent a room for himself and Sperber. He gave the rest of the money to Sperber's brother, who was supposed to go trade a gun, along with the money, for an ounce of methamphetamine.

The Hillards called Goodpaster several times during the day, but he told them he had not heard from Sperber's brother yet. Later that night, Heidi and Jeff met Bussart and

3

Morris, and they went to Goodpaster's hotel room to check on the deal. When they arrived, both Goodpaster and Sperber were asleep. After gaining access to the room, they woke up the sleeping couple and questioned them for nearly an hour. Morris stood in front of the door during the questioning.

Someone eventually got in touch with Sperber's brother, and he reported he had been arrested. Heidi became angry, believing Goodpaster and Sperber had stolen her money. The Hillards then decided everyone should go back to their house. Goodpaster left with Bussart and Morris in a truck. Sperber left with Heidi and Jeff in another car.

Bussart, Morris, and Goodpaster arrived at the Hillards' house around 4 a.m. They all smoked methamphetamine in the truck. They then went inside the house and waited for the Hillards and Sperber. The Hillards, on the other hand, spent the next couple of hours driving around and questioning Sperber. Sperber eventually made up a story about Goodpaster planning to get the Hillards arrested or robbed. Heidi became concerned she might lose custody of her two young daughters if she were arrested again.

The Hillards and Sperber arrived at the house around 6:30 a.m. The Hillards took Sperber into a shed on their property. Bussart went out to the shed, and Heidi told him that Goodpaster and Sperber had a plan to get her in trouble with the police and DCF (Kansas Department for Children and Families). Bussart went back into the house to get Goodpaster. Morris followed the two of them back out to the shed.

Over the next several hours, Heidi, with the help of Jeff and Morris, interrogated and tortured Goodpaster, apparently seeking information about the alleged set up. During the interrogation, Morris and Jeff struck Goodpaster in the head with their hands or fists. Heidi tased Goodpaster and hit his knee with a baseball bat. She stuck wooden cuticle

4

sticks into his ears and cut one of his ears with a knife. She cut open his shorts and underwear, threatening to cut his testicles. At one point, Jeff and Morris held Goodpaster down while Heidi tried to staple his eyes and mouth shut. Sperber testified she saw Morris hit Goodpaster's knee with the spray gun and the flat end of an ax during the interrogation in the shed. She also saw Jeff and Morris each holding one end of an extension cord and using it to choke Goodpaster.

Goodpaster tried to escape from his tormentors several times. The first time he tried to escape, Bussart caught him before he made it out of the shed. The second time he made it just outside the door before Bussart, Morris, and Jeff caught him and brought him back inside. Goodpaster was then ziptied to a chair.

Later, Bussart left to change clothes and then returned to the shed during Goodpaster's interrogation. Around 10 a.m. he left again to go get cigarettes. While Bussart was gone, Goodpaster made another escape attempt. He jumped through a closed window, shattering glass and cutting himself before being pulled back into the shed. Goodpaster made a final escape attempt shortly before Bussart returned, but Jeff and Morris tackled and restrained him.

When Bussart pulled into the driveway on his return, everybody was outside. Jeff and Morris were holding Goodpaster down on the ground. Morris brought some tape outside, and they taped Goodpaster's mouth shut. Jeff got a rope, and Bussart put it around Goodpaster's feet. Morris, Bussart, and Jeff then used the rope to pull Goodpaster into the backseat of the truck. Goodpaster tried to use his feet to resist being pulled in the truck but was unsuccessful. Jeff then got in the driver's seat, Bussart got in the passenger seat, and Morris got in the backseat with Goodpaster.

5

When Goodpaster made his final escape attempt, it caught the attention of Jeff's mother, who lived next door. She saw Jeff holding someone down on the ground. She also saw a man come from the Hillards' shed. A truck then pulled up, a man got out, and three men appeared to load someone into the truck. After the truck left, she called 911 because she thought someone was getting hurt.

After leaving the house, Jeff first drove to the home of his former brother-in-law, Craig Bright. Jeff asked to stash something at Bright's house and said Bright did not need to know what it was. Jeff's arms were covered in blood. Bright asked what was going on, and Jeff said, "It's for the girls." Bright saw someone or something slumped in the truck's backseat. Bright said Jeff could not stash anything there, and he needed to leave. Bright also gave them some paper towels and cleaner, hoping it would speed up their departure. After Jeff left, Bright called 911 because he thought there might be a body in the truck.

Jeff then drove Bussart, Morris, and Goodpaster to the town of Sedgwick. They stopped to get gas and some drinks before driving out to the country to find a place to dispose of Goodpaster. They eventually found an open gate and drove through a field until they reached the tree line. Jeff, Bussart, and Morris used the rope to drag Goodpaster to a creek area. Jeff told Bussart to tie the rope around Goodpaster's neck. Jeff then tossed the rope over a tree and pulled Goodpaster's body up. Morris was already back at the truck by the time Jeff finished hanging Goodpaster's body.

Jeff, Bussart, and Morris cleaned themselves off with the cleaner and paper towels Bright had given them. They went to a car wash to wash out the truck. Finally, they stopped at Wal-Mart to get some new clothes.

Law enforcement was dispatched to the Hillards' home in response to the 911 calls. There, they found Heidi, Sperber, and Heidi's two daughters inside the house. They also found the bloody scene in and around the shed on the Hillards' property. Later that evening, Jeff returned while law enforcement was still at his home. Morris was arrested several days later, still wearing the new jeans he had bought at Wal-Mart.

Law enforcement discovered Goodpaster's body on Saturday, November 12, 2016. He was hanging from a tree in a creek ravine in Harvey County. His body was covered in superficial skin injuries, including abrasions, contusions, lacerations, and puncture wounds. After an autopsy, a forensic pathologist ruled Goodpaster's death was due to asphyxiation by hanging. The pathologist later testified Goodpaster could have possibly died of positional asphyxiation while he was in the back of the truck. Goodpaster also had a potentially toxic amount of methamphetamine in his system, but the pathologist did not believe this was the cause of Goodpaster's death given all the circumstances.

The State ultimately charged Morris with first-degree premeditated murder or, in the alternative, first-degree felony murder, aggravated kidnapping, aggravated battery, and conspiracy to distribute a controlled substance. In addition, it also prosecuted Morris under an aiding and abetting theory of criminal responsibility.

At trial, Bussart, Sperber, and other witnesses testified consistent with the previous recitation of facts. Bussart also testified he spent most of the day on November 5, 2016, with Morris, and Morris was aware of the drug deal with Goodpaster. Bussart believed Goodpaster died in the truck shortly after they left the Hillards' because he did not hear any sounds from Goodpaster after that.

7

In addition to witness testimony, video footage from the Hillards' security surveillance system, and numerous photographs, the State also introduced several recordings Heidi had made with a cell phone. These recordings included an 82-minute audio recording of the interrogation and torture of Goodpaster. On that recording, Morris could be heard occasionally asking Goodpaster questions or ordering Goodpaster to provide answers, sometimes followed by a slapping sound. At one point, Heidi said, "I'm gonna have to get the fuckin' gun," followed by Morris ordering Goodpaster to "stay there motherfucker!" Another time Heidi said, "Earl, it's your call," followed by a loud smacking sound. Morris also told Goodpaster, "We gonna get rid of your ass!" Heidi and Jeff made similarly threatening statements, such as: "Cause you see you know that three people can keep a secret as long as two are dead?", "[I] don't wanna kill him yet we need him to talk still," and "Either way you [*sic*] a dead motherfucker."

Morris testified in his own defense. He said he was drunk or high the whole time Goodpaster was being tortured. He said he had had four or five 24-ounce beers and "was doin' a little drugs" on November 5, 2016. He had also smoked methamphetamine in the truck outside the Hillards' home in the early morning hours of November 6, 2016. He also said he had been up for about four or five days. When asked, "Were you thinkin' straight?" he responded, "Man, my mind was gone, shot."

Morris testified he did not pay much attention to what was going on while he was in the shed because he was trying to untie a gold chain that Heidi had given him to untangle. He denied restraining anyone or preventing anyone from leaving. He admitted that he, Jeff, and Heidi were talking like they were going to kill Goodpaster, but he thought Heidi was joking about it. He claimed he hit Goodpaster's head only once. He said he was just encouraging Goodpaster to answer Heidi's questions, so Heidi would leave Goodpaster alone.

8

Morris also testified Jeff asked him to go get some tape after Goodpaster's last escape attempt. He said he thought Jeff was going to use it to bandage Goodpaster's wounds. Morris said Bussart and Jeff were the ones who pulled Goodpaster into the truck. He said he asked Jeff to take him home after they left the Hillards' house, but Jeff said they were going to drop Goodpaster off first. Morris believed Goodpaster was still alive when Jeff and Bussart dragged him to the creek area. He said he could not see what they were doing, and he did not know what was going on.

The jury convicted Morris on all counts, including both alternative theories of first-degree murder. The district court sentenced Morris to life in prison without the possibility of parole for 50 years for first-degree premeditated murder, plus a total of 280 consecutive months for the other counts. Morris appeals.

ANALYSIS

*Voluntary Intoxication Instruction*

The first issue on appeal is whether the district court erred in denying Morris' request for a jury instruction on voluntary intoxication. At the jury instruction conference, Morris requested several jury instructions on voluntary intoxication based on PIK Crim. 4th 52.050, 52.060, and 52.070 (2018 Supp.). The State opposed Morris' request, arguing Morris had presented evidence of consumption only, and no evidence suggested he was so intoxicated he lacked the ability to form an intent. The district court denied Morris' request, holding the evidence was "not anywhere near what is needed in order to justify a voluntary intoxication" instruction.

9

This court follows a four-step process when reviewing jury instruction issues. First, we consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review. Second, we use unlimited review to determine whether the instruction was legally appropriate. Third, we determine whether the evidence, when viewed in the light most favorable to the defendant or requesting party, was sufficient to warrant the instruction. Finally, if the district court erred, we determine whether the error was harmless, using the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012). *State v. Murrin*, 309 Kan. 385, 391, 435 P.3d 1126 (2019).

Morris requested a voluntary intoxication instruction, so he has preserved this issue for review. And, voluntary intoxication was an available defense based on Morris' charges. Voluntary intoxication may be a defense to any crime that requires a specific intent. See K.S.A. 2016 Supp. 21-5205(b); *Murrin*, 309 Kan. at 397. Both parties focus on Morris' conviction for first-degree premeditated murder, which is a specific intent crime. *State v. Mattox*, 305 Kan. 1015, 1025, 390 P.3d 514 (2017). The State also prosecuted Morris under an aiding and abetting theory of criminal responsibility. In such cases, voluntary intoxication may be a defense to show a defendant was incapable of forming the intent to aid the commission of a crime. See PIK Crim. 4th 52.050 (2018 Supp.). And under an aiding and abetting theory, the State still had to prove Morris had the specific intent of premeditation to secure a conviction. *State v. Soto*, 301 Kan. 969, Syl. ¶ 12, 349 P.3d 1256 (2015).

Even though voluntary intoxication was a legally available defense to Morris' first-degree premeditated murder charge and conviction, the district court would only have been required to give the instruction if it was factually appropriate. Generally, a defendant is entitled to instructions on the law applicable to his or her defense theory if

10

there is sufficient evidence, when viewed in the light most favorable to the defendant, for a rational fact-finder to find for the defendant on that theory. *Murrin*, 309 Kan. at 391. As for a voluntary intoxication instruction, the evidence would need to show the defendant was intoxicated to a degree that would impair his or her ability to form the requisite intent. Such an instruction may be appropriate if the evidence shows the defendant was so intoxicated he or she could not reason, remember, plan, or exercise motor skills. *State v. Reed*, 302 Kan. 390, 400, 352 P.3d 1043 (2015). But "evidence that a defendant has consumed alcohol or drugs, or that a defendant is 'high' or 'intoxicated,' does not permit an inference that the defendant was so impaired that he or she was unable to form the requisite intent." *State v. Kidd*, 293 Kan. 591, 595, 265 P.3d 1165 (2011).

The evidence at trial was enough to allow a rational fact-finder to conclude Morris had consumed drugs and alcohol and thus was possibly impaired during the commission of the crimes. Morris testified he was drunk or high while Goodpaster was being tortured. He said he had been drinking the day before Goodpaster's kidnapping and murder. He and Bussart also testified they had smoked methamphetamine with Goodpaster in the truck after they arrived at the Hillards' house. Surveillance footage shows the three men going out to the truck around 4:15 a.m. and returning to the Hillards' house around 4:30 a.m.

All the same, little to no evidence showed Morris was intoxicated to a degree that would impair his ability to form the necessary intent. Morris claimed "[his] mind was gone," but this claim is undercut by his own testimony. Morris was able to provide a coherent narrative of what happened on the morning of November 6, 2016, including what he did and why he did it. See *State v. Davis*, 306 Kan. 400, 414-15, 394 P.3d 817 (2017) (holding ability to provide coherent narrative undercuts claim of intoxication sufficient to warrant an instruction). He acknowledged he could walk and talk. He

11

admitted he could perceive Goodpaster's need for help, and he claimed he tried to help Goodpaster. The audio recording also shows Morris was able to understand and participate in Goodpaster's interrogation. And, no one else testified Morris appeared intoxicated.

As the State also points out, Morris did not claim he drank alcohol or smoked methamphetamine after about 4:30 a.m. on November 6, 2016. This was two and a half hours before Goodpaster was taken out to the Hillards' shed. And, it was more than six hours before Jeff, Bussart, and Morris loaded Goodpaster into the truck and left the Hillards' house.

A voluntary intoxication instruction may have been a legally available defense to Morris' first-degree murder charge and conviction. That said, a voluntary intoxication instruction would not have been factually appropriate because insufficient evidence supported Morris' voluntary intoxication defense. See *State v. Betancourt*, 299 Kan. 131, 142-43, 322 P.3d 353 (2014) (holding evidence that defendant consumed alcohol and cocaine and may have been impaired insufficient to require voluntary intoxication instruction); *State v. Hernandez*, 292 Kan. 598, 607, 257 P.3d 767 (2011) (holding evidence that defendant consumed alcohol and marijuana and testimony that defendant was high or intoxicated insufficient to require instruction). As a result, the district court did not err in declining to give Morris' requested instructions.

*Gruesome Photographs*

Next, Morris argues the district court erred when it admitted photographs of Goodpaster's body at trial. Because Goodpaster's body had been outside and exposed to the elements for almost a week, it had started decomposing, causing some discoloration

of his skin. His body also had some damage due to animal activity. Much of his nose was gone, as well as some muscle tissue on his arms, and these areas had turned black. Morris contends the photographs of Goodpaster's body were gruesome and had little, if any, probative value.

When reviewing a district court's decision to admit photographic evidence, an appellate court must first decide if the photographs are relevant. Evidence is relevant, and thus generally admissible, if it has a reasonable tendency to prove any material fact. That said, a district court may still exclude relevant evidence if the evidence presents a risk of undue prejudice which substantially outweighs its probative value. *State v. Seba*, 305 Kan. 185, 213, 380 P.3d 209 (2016); see also K.S.A. 60-401(b); K.S.A. 60-445.

If a party has argued photographs are prejudicial because they are unduly repetitious, gruesome, or inflammatory, an appellate court reviews the district court's decision for an abuse of discretion. *Seba*, 305 Kan. at 213. The party alleging an abuse of discretion bears the burden of proof. *State v. Mireles*, 297 Kan. 339, 354, 301 P.3d 677 (2013). "Admission of photographs that are unduly repetitious and cumulative, or that are introduced solely for a prejudicial purpose, constitutes an abuse of discretion, albeit such a finding is rare in a murder case. [Citation omitted.]" 297 Kan. at 354.

To begin with, the State argues Morris has not preserved this issue for appeal because he did not lodge a specific objection to the photographs. K.S.A. 60-404 generally precludes an appellate court from reviewing an evidentiary challenge absent a timely and specific objection made on the record. *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862, *cert. denied* 137 S. Ct. 310 (2016).

13

Before trial, Morris filed a motion in limine to exclude all photographs of Goodpaster's body. According to Morris, the State had several hundred gruesome photographs of Goodpaster's partially decomposed body. Because the State intended to present testimony about Goodpaster's injuries and cause of death, Morris argued the photographs had little probative value and would serve only to inflame and prejudice the jury.

The State filed a response arguing the photographs were critical to show Goodpaster's injuries and cause of death. It added it only intended to use about 34 of the 411 autopsy photographs, choosing the ones most relevant to Goodpaster's injuries. The State also intended to introduce about 14 crime scene photographs, taken at various distances from his body.

At a motions hearing, Morris' defense counsel told the court he was "overall objecting to any photos of the corpse," but added the ones he was most concerned about were not included in a revised list of photographs the State intended to offer at trial. Defense counsel reiterated he was standing by his motion in limine, but he said he had a particular problem with only one photograph on the list, later admitted as State's Exhibit 267. The photograph showed Goodpaster's face and depicted the damage to his nose. Defense counsel objected to the photograph because maggots were visible in the nose area.

The State responded that the pathologist had chosen that photograph to show puncture marks around Goodpaster's mouth which could have been caused by a staple. Neither party was aware of a less graphic photograph showing the puncture marks. But the State agreed to try to crop out the nose area.

14

After verifying defense counsel was only objecting to that one photograph in particular, the district court overruled "that specific objection" because the photograph was highly relevant. The court asked the State to block out the nose area. It also said it would revisit its ruling if defense counsel thought the State had not done an adequate job of editing the photograph.

The State ultimately offered 12 crime scene photographs at trial as State's Exhibits 85 through 94, 96, and 99. Before the district court admitted the photographs, defense counsel told the court, "I just stand by my earlier objections that were made prior to trial." The State later offered 33 autopsy photographs as State's Exhibits 237-269. Before the forensic pathologist took the stand, the district court reviewed State's Exhibit 267. The State had blurred out Goodpaster's nose, and defense counsel agreed the State had done an adequate job of editing the photograph. Before admitting the photographs, the court asked defense counsel if he had any objections, and he responded, "Only what was previously made, Your Honor."

At this juncture, we need not determine whether this issue was properly preserved because Morris' argument clearly fails on its merits. In a criminal case, the State has the burden to prove all the elements of the crime charged. Photographs used to prove the elements of the crime, including the manner of death and violent nature of the crime, are relevant and admissible. "Photographs depicting the extent, nature, and number of wounds inflicted are generally relevant in a murder case." *State v. Hilt*, 299 Kan. 176, 196, 322 P.3d 367 (2014).

Morris asserts the State could have made its case with fewer crime scene and autopsy photographs, and, "[c]onsidered collectively, they had no additional probative value and added nothing to the State's case, and the trial court abused its discretion when

it admitted them." We agree some of the photographs may have repetitious, but we find the district court did not err in admitting them, given their probative value.

State's Exhibits 85 through 94, 96, and 99 depicted the area where Goodpaster's body was found, and 10 of the 12 photographs show his body. His body was in a relatively nondescript area of Harvey County, along a wooded ravine near a farmer's field road. State's Exhibit 85 is taken from the field road. Goodpaster's body is not visible in this photograph. State's Exhibits 86, 87, and 88 show the scene as one approached the ravine, getting incrementally closer to his body.

State's Exhibits 89 through 92, 94, 96, and 99, depict Goodpaster's body as it was found, while State's Exhibit 93 shows only a spot of blood on the tree trunk. The photographs of Goodpaster's body are all taken at different angles and from varying distances. They depict Goodpaster's body hanging from a tree by a rope. He is wearing only a pair of shorts, a pair of boxers, one sock, and one shoe.

State's Exhibits 86 through 88 show only the upper half of his body from a fair distance. Four photographs show his full body from different angles and distances. One photograph primarily shows multiple small skin injuries on his back. Another primarily shows the injuries to the front of his torso, including a large reddish mark covering his chest and abdomen. The photographs of the back and torso injuries are somewhat duplicative of several autopsy photographs, including State's Exhibits 237, 243, 244, 246, and 265. State's Exhibit 99 shows Goodpaster's shorts and boxers are cut open, partially exposing his genitals.

State's Exhibits 237 through 269 depict the condition of Goodpaster's body at the beginning of the autopsy. The forensic pathologist testified Goodpaster had so many

16

abrasions on his back that "you really almost need the photograph to appreciate, because they're fairly numerous." He also testified the photographs would help the jury understand his testimony about the autopsy and cause of death "particularly in this case, with the multitude of superficial injuries."

Of the autopsy photographs, several depict Goodpaster's entire body, both front and back. Other photographs depict injuries on various body parts. For example, several photographs show the ligature mark around Goodpaster's neck from different angles. Other photographs show injuries on the back of his upper and lower left leg and the back of his upper and lower right leg. Still others show injuries on his left and right arms and left hand. State's Exhibit 256 depicts a scalp injury possibly caused by a "rounded striking instrument." Several photographs also depict items found on Goodpaster's body. No photographs of his body during or after the surgical autopsy were admitted.

Perhaps the most gruesome aspect of the autopsy photographs is the animal damage to Goodpaster's body. This damage is visible in numerous photographs. State's Exhibit 250 and 259, depicting his left and right arm respectively, show missing muscle tissue. State's Exhibit's 267, 268, and 269 show the damage to his nose up close. While the State blurred out the nose area in State's Exhibit 267, the damage also is visible in the other two photographs. The damage to the nose also is visible in several other photographs showing the front or side of Goodpaster's head.

The photographs in this case served several evidentiary purposes. First, the crime scene photographs, as well as the autopsy photographs showing the ligature marks on Goodpaster's neck, supported the pathologist's ruling on Goodpaster's cause of death. The autopsy photographs also helped show the nature and extent of Goodpaster's wounds, which were relevant not only to Morris' first-degree murder charges, but also his

aggravated kidnapping and aggravated battery charges. These charges required the State to prove Goodpaster had sustained bodily harm and great bodily harm respectively. See K.S.A. 2016 Supp. 21-5408 ("Aggravated kidnapping is kidnapping . . . when bodily harm is inflicted upon the person kidnapped."); K.S.A. 2016 Supp. 21-5413 ("Aggravated battery is . . . [k]nowingly causing great bodily harm to another person . . . .").

The photographs also helped to corroborate the testimony of Sperber and Bussart. For instance, State's Exhibit 263, showing a laceration on Goodpaster's right ear, corroborated testimony that Heidi had cut his ear. State's Exhibit 267 and 268 show small puncture marks around Goodpaster's mouth and left eye. In State's Exhibit 269, a staple found in Goodpaster's beard is being held up to two puncture marks to demonstrate the space between the marks is consistent with the width of the staple. These photographs corroborated Sperber's testimony that Heidi had tried to staple Goodpaster's eyes and mouth shut. Corroboration was particularly important in this case because both witnesses had credibility issues. Bussart was an accomplice witness. He had pleaded guilty to felony murder, and the State dismissed his other charges in exchange for his testimony. And, Sperber had a prior conviction for filing a false report that she had been kidnapped.

Even if the State could have proved its case with fewer photographs, this is not the standard when reviewing the admission of photographic evidence on appeal. While a few of the admitted photographs may have been repetitious, they were not unduly so. And while many of the photographs may have been gruesome, they were relevant and admissible to show the manner and violent nature of Goodpaster's death and corroborate Sperber's and Bussart's testimonies. See *State v. Robinson*, 293 Kan. 1002, 1030, 270 P.3d 1183 (2012). As a result, the district court did not abuse its discretion in admitting the photographs.

18

*Cumulative Error*

Finally, Morris argues cumulative error denied him a fair trial. In a cumulative error analysis, an appellate court collectively considers all errors, even if those errors would be harmless individually, to determine if their combined effect denied the defendant a fair trial. *State v. James*, 309 Kan. 1280, 1311, 443 P.3d 1063 (2019). The court will find no cumulative error when the record fails to support the errors defendant raises on appeal. *State v. Marshall*, 303 Kan. 438, 451, 362 P.3d 587 (2015). A single error cannot support reversal under the cumulative error doctrine. *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018). And, no prejudicial error will be found under the cumulative error doctrine if the evidence against the defendant is overwhelming. *James*, 308 Kan. at 1311.

The record does not support either of Morris' alleged errors. What's more, the evidence of Morris' guilt was overwhelming. Thus, cumulative error did not deprive Morris of a fair trial.

Affirmed.

MICHAEL E. WARD, Senior Judge, assigned.[1]

_____

[1]**REPORTER'S NOTE:**  Senior Judge Ward was appointed to hear case No. 119,911 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.

20