IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 122,645

STATE OF KANSAS,
*Appellee*,

v.

ALIFONSO EDUARDO GARCIA,
*Appellant*.

SYLLABUS BY THE COURT

1.

A small community and pervasive recognition of a case among its members does not, on its own, require a court to presume any jury will be prejudiced against the defendant.

2.

Autopsy photographs that depict a victim's wounds are generally relevant in a murder trial.

3.

Autopsy photographs are not unduly prejudicial simply because they are difficult to view.

4.

A party cannot show a jury instruction would have been factually appropriate based on hypothetical scenarios; there must be evidence in the record to support the instruction.

Appeal from Rooks District Court; BLAKE A. BITTEL, judge. Opinion filed April 29, 2022. Affirmed.

*Peter T. Maharry,* of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Michael J. Duenes*, assistant solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.:  A jury found Alifonso Eduardo Garcia guilty of premeditated first-degree murder. The court sentenced Garcia to life without the possibility of parole for 50 years. We affirm his conviction and sentence.

FACTUAL AND PROCEDURAL HISTORY

On March 19, 2018, police officers found Alexis Garcia (Alexis) dead in her home in Plainville, Kansas, inside of Rooks County. She had been beaten and there was a laceration across her neck. Her husband, Alifonso Garcia, lay on the floor in the same room. He was motionless and had a laceration across his neck. Garcia survived his wounds, and the State charged him with first-degree premeditated murder in Alexis' death. It theorized that Garcia was upset and angry because Alexis was seeking a divorce, so he killed her and then cut his own throat. The jury convicted him as charged based on the facts that follow.

On March 6, 2018, Alexis called the police looking for advice. She told the dispatcher that she had informed Garcia she wanted a divorce and that Garcia had told her she could no longer be in their home. Throughout the course of the next few weeks, Alexis reported to a friend and her mother that Garcia was angry that she was leaving, but

2

that she had to go because he was controlling and drinking excessively. She told the friend that Garcia had never been violent and did not think he would become violent but "[you] never know."

On March 17, 2018, Alexis and her young daughter, S.G., had lunch at a restaurant in Hays with Alexis' aunt and some other family members. Footage from a security camera at Alexis' home showed she and S.G. returned to the house around 3:15 p.m. Garcia was also home at this time; the camera footage showed him going in and out of the house to smoke cigarettes and talk on the phone between 3 p.m. and 4:30 p.m. Around 7 p.m., Alexis went out of the house and returned carrying some lumber. The camera system, which records only when it senses motion, offered no footage for the next 23 hours. The footage picked up again on March 18, around 5 p.m., and showed Garcia leaving the house and getting into the car with S.G.

When Garcia left the house with S.G., he traveled to his mother's and father's house in Abilene. They had not been expecting him. Garcia asked his mother to watch S.G., then sat with S.G. while she ate, looked at a home remodel project his father was working on, and left. The security footage at Garcia's home showed him returning around 10 p.m. on March 18.

Around the time he returned home, Garcia called his father, Jose, and his brother, Jovany. Garcia told Jose "a tragedy had happened" and asked him to come to his house. When Garcia called Jovany, he was crying and asked Jovany for help. He told Jovany that Alexis was dead. Garcia said that he and Alexis had been feeding their daughter when he turned around, heard a noise, turned back around, and saw Alexis on the floor. No phone calls were answered or made from Garcia's phone after 11:02 p.m.

Jovany called the police. He told the dispatcher he thought his brother needed help and provided his address. Jovany continued to call the police between 10 p.m. and 4 a.m.,

3

when his girlfriend arrived with his car and he and Jose were able to drive to Garcia's home.

Upon Jovany's emergency call, officers were dispatched to Garcia's and Alexis' home for a welfare check. They arrived around 11 p.m. and knocked on the door, but no one answered. The front and back doors were locked. After concluding they did not have authority to enter the locked house, officers continued to watch the house until Jovany arrived. When Jovany got there around 4 a.m., officers asked him to kick in the door.

Upon searching the house, officers found Alexis dead on a bed and Garcia motionless but alive on the floor. Garcia was transported to a hospital where he was treated for his wounds. The treating doctor and a forensic nurse who examined Garcia found swelling and abrasions on his hands but, apart from the laceration to his neck, found no trauma to any other part of Garcia's body.

Alexis had bruises on her face and hands, injuries to her face and lips, and a laceration across her neck. A coroner would testify that he believed the hand injuries indicated Alexis had them up to protect herself. He would also explain that Alexis had been face down when she died and that her body had been moved since death. The coroner would further testify that Alexis died by homicide through "asphyxia caused by pressure to the face."

The State charged Garcia with first-degree premeditated murder. Before the trial began, Garcia asked the court to authorize funding for a venue study and moved for a change in venue. The court approved the study but conditioned it on the Board of Indigents' Defense Services (BIDS) agreeing to fund the study. BIDS never agreed, so Garcia did not receive a venue study. The court denied the motion to change venue.

Garcia testified in his own defense at trial. Paraphrasing his own words, he told the jury that, on March 18, he was at home with Alexis and S.G. While using the bathroom, he heard something fall and then Alexis yelled and S.G. started to cry. When he found them, Alexis had a lot of blood on her hand. S.G. also had blood on her hand and was on the floor crying and scared. Garcia took S.G. to a bedroom and went back to Alexis, who was very scared. Alexis told Garcia to take their daughter out of the house so she would not see Alexis in the condition she was in. Garcia took S.G. to his parents' house. He noticed blood around the couch as he was leaving.

Garcia further testified that when he returned from his parents' house, he found Alexis dead. Garcia attempted CPR and tried to call someone, but he did not know who he was trying to call. He testified that he heard steps in his living room, saw a "shade moving," and was then hit in the head. Garcia then ran to the bedroom and closed the door, but someone named "Justin" was pushing the door in on the other side. He gave up on the door, felt a scratch on his neck, saw blood, and then felt dizzy. Garcia told the jury he then made a video leaving his things to family members and woke up in the hospital.

The jury convicted Garcia of first-degree premeditated murder. The court sentenced him to life in prison without the possibility of parole for 50 years.

ANALYSIS

*Venue Change*

Before trial, Garcia moved for a venue change. The district court denied the motion. Garcia argues this violated his right to an impartial jury under the United States and Kansas Constitutions. We disagree and affirm the trial court's decision.

The Sixth Amendment to the United States Constitution provides "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. It is applicable to the states through the Fourteenth Amendment. *State v. Carr*, 300 Kan. 1, 56, 331 P.3d 544 (2014), *rev'd and remanded on other grounds* 577 U.S. 108, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016). The Kansas Constitution also affords a right to an impartial jury, but this court has not analyzed the state constitutional right differently from the federal constitutional right and neither party asks us to do so here. *Carr*, 300 Kan. at 56.

The guarantee of an impartial jury affords the defendant a right to change venue in two situations:  (1) when the circumstances show the court should presume the jury will be prejudiced against the defendant or (2) when jury selection reveals there is actual prejudice among the jury. *Carr*, 300 Kan. at 57.

"Courts should presume prejudice, even before voir dire, when 'pretrial publicity is so pervasive and prejudicial that [a court] cannot expect to find an unbiased jury pool in the community.'" *State v. Longoria*, 301 Kan. 489, 506, 343 P.3d 1128 (2015) (quoting *Carr,* 300 Kan. at 57). Courts apply the seven factors enunciated in *Skilling v. United States,* 561 U.S. 358, 381-85, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010), when considering whether to presume prejudice:

> "'(1) media interference with courtroom proceedings; (2) the magnitude and tone of the coverage; (3) the size and characteristics of the community in which the crime occurred; (4) the amount of time that elapsed between the crime and the trial; (5) the jury's verdict; (6) the impact of the crime on the community; and (7) the effect, if any, of a codefendant's publicized decision to plead guilty.'" *Longoria*, 301 Kan. at 506 (quoting *Carr,* 300 Kan. at 62).

"Defendants face a high burden under the *Skilling* test—generally a defendant can obtain a change of venue only upon showing that publicity has displaced the judicial

process entirely or that the courtroom proceedings more resemble a circus or a lynch mob." *Longoria*, 301 Kan. at 506.

Actual prejudice occurs when "'the effect of pretrial publicity manifested at jury selection is so substantial as to taint the entire jury pool.'" *Longoria*, 301 Kan. at 508 (quoting *Carr*, 300 Kan. at 57). When considering whether actual prejudice existed, "a trial court must 'review the media coverage and the substance of the jurors' statements at voir dire to determine whether a community-wide sentiment exists against the defendant. Negative media coverage by itself is insufficient to establish actual prejudice.'" *Longoria*, 301 Kan. at 508-09 (quoting *Carr,* 300 Kan. 1, Syl. ¶ 6).

In reviewing a trial court's decision on whether presumed prejudice existed, this court applies a bifurcated standard of review. We consider whether substantial competent evidence supports the trial court's findings of fact. We review any legal conclusions de novo. *Longoria*, 301 Kan. at 506. In reviewing whether actual prejudice existed, this court reviews the district court's conclusions for an abuse of discretion. *Carr*, 300 Kan. at 75. We analyze each separately.

### *Presumed Prejudice*

Garcia moved for a change of venue before trial began. He argued he could not receive a fair trial in Rooks County because of the nature of the crime, the low population in Rooks County, and the pretrial publicity through "talk of the town." The district court denied the motion and made the following findings and conclusions:

> "I will order at this time, because there had previously been a motion to change
> venue and there was also a request by the defense to seek a venue study, without making
> a finding or ruling on whether a venue study was necessary or not, or for the Court to
> make a final determination as to a change of venue or not, I did allow the defendant to

7

seek a venue study to see whether they could seek that out and that has not come to fruition.

"I have reviewed the motion, I have reviewed the case law, and I have reviewed the State's response. I will comment that based upon that, the burden is on the defendant to show prejudice exists in the community, not mere speculation, but the reality that it has to be demonstrated. In other words, the prejudice has to be reasonably certain.

"The case law talks about pretrial publications, any publications, and this is a small community, however, any publications were minimal. Plus, quite a bit of time has passed. I believe that in this community the process of voir dire will work, and we should go through that process in order to find an impartial jury, keeping in mind our Constitution and the case law, the Supreme Court case law, which has interpreted our Constitution, which has made findings that an impartial jury—if we have jurors in here that say they've heard about the case or read about the case, that doesn't necessarily mean they are not impartial, There's further questioning in voir dire to get to the point of whether they can be fair and impartial jurors even though they may have heard about the case.

"There's not been sufficient indication that the prejudice exists, so I would overrule the motion to change venue, and find at this time that even though a venue study was not sought, it was not needed in order for me to make that determination."

After this hearing, the court sent out juror questionnaires. One hundred community members returned them. These questionnaires asked, among other things, whether respondents had heard about the case, whether they had an opinion on the case, and whether they could set any opinion aside to render a verdict. By Garcia's count, 29 indicated they knew nothing about the case, 71 stated they had heard something about the case from news, friends, or other sources, and roughly 33 had formed some opinion on the case. Garcia points to only one questionnaire in which a potential juror indicated they could not set an opinion aside to render a verdict. The State does not disagree with Garcia's characterization of the jury questionnaires.

8

Before voir dire began, Garcia renewed his motion, asking for "a change of venue, or in the alternative for a motion objecting to the venire that has now been chosen." Garcia asserted that the juror questionnaires showed that 45% of the 107 people in the jury pool had an opinion on the case and that this meant any jury would be prejudiced against him. The district court denied the motion. It ruled:

> "Okay, I'm going to overrule the change of venue at this time for the reasons stated in the previous order after the previous hearing. With regard to the objection to venire, I believe that those opinions and questions can be fleshed out in the voir dire process. And each side, the State and the defendant, will get a fair opportunity to question each and every one of those jurors in voir dire to flesh out those things, and also give them some further instruction with regard to the presumption of innocence and the concept of reasonable doubt and have the opportunity to object to those people for cause curing that process."

On appeal, Garcia argues the court erred in denying this motion. Although the court's factual findings were minimal, Garcia does not challenge those findings as insufficient. Consequently, we accept them as they appear in the record. See *Carr*, 300 Kan. at 65 (when party failed to seek more complete recitation or writing to explain ruling on denial of venue change, appellate court assumes trial court made necessary findings of fact). Garcia challenges the court's legal conclusions; he insists the responses to the jury questionnaires and the small size of the community sway many of the *Skilling* factors in his favor and lead to a legal conclusion of presumed prejudice. We disagree. On review, only the size and characteristics of the community and the impact of the crime on the community weigh in favor of finding presumed prejudice. The remaining factors are neutral, weigh against such a finding, or are inapplicable. We address each in turn.

The first factor is media interference with the courtroom. Garcia acknowledges that the media did not interfere with the courtroom proceedings. This factor weighs against presuming prejudice.

The next factor is the magnitude and tone of pretrial press coverage. The district court concluded that media coverage of this case was minimal. Garcia does not disagree. However, he argues the coverage that existed and the "'town talk' . . . predisposed the community against [him]." Garcia points to the jury questionnaires to support this assertion. He insists the questionnaires "showed this bias."

Garcia is correct that many of the jury questionnaires revealed that respondents learned about Alexis' murder by speaking with other members of the community. But it is questionable whether "town talk" has any relevance to this factor. It traditionally contemplates whether *media coverage* was inflammatory or somehow untrue. See *State v. Robinson*, 303 Kan. 11, 75, 363 P.3d 875 (2015) (second *Skilling* factor does not support change of venue because media coverage was "predominantly fact-based reporting"), *disapproved of on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017); *Longoria*, 301 Kan. at 507 ("simply proving extensive media coverage does not establish prejudice, especially where the coverage is factual"); *Carr*, 300 Kan. at 67 ("primarily factual tone of the press coverage" meant factor did not weigh in favor of presumed prejudice).

Even if "town talk" has relevance here, Garcia fails to show that this talk was "gratuitously lurid," or untrue, as it must be to sway this factor towards prejudice. See *Carr*, 300 Kan. at 66. This court has explained that "the Sixth Amendment does not demand juror ignorance," and, consequently, "'pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial.'" *Carr*, 300 Kan. at 65-66 (quoting *Skilling*, 561 U.S. at 384). Because Garcia offers nothing to suggest the town talk was

10

scandalous, inflammatory, or less than factual, this factor weighs against presuming prejudice.

The third factor is the size and characteristics of the community in which the crime occurred. The district court noted Plainville was a small community. Garcia agrees but argues the court did not give this "any weight" and it should have factored heavily in favor of a venue change.

This factor supports a finding of presumed prejudice when the community in which the crime occurred is small. See *Longoria*, 301 Kan. at 507 (factor supported venue change when town consisted of 20,546 residents). Citing to the census bureau website, Garcia asserts that Rooks County has a population of slightly less than 5,000 people. Such a small community weighs in favor of finding prejudice, as Garcia argues. The State concedes this. But there is no indication the district court gave this factor little or no weight. It appears the court considered this factor to weigh in favor of a venue change. It noted "this is a small community, *however*, any publications were minimal." (Emphasis added.) The court appropriately weighed this factor for presuming prejudice.

The fourth factor addresses the amount of time that elapsed between the crime and trial. The district court concluded "quite a bit of time" had passed between the crime and the hearing on the motion. It appeared to weigh this against presuming prejudice. Garcia argues this factor did not weigh against presumed prejudice because the pretrial publicity continued until the time of trial. He points to the jury questionnaires in support, arguing they showed that "pretrial publicity was still pervasive" because they indicated over two-thirds of the jury pool remembered stories about the case.

In *Carr*, this factor was inconclusive when 17 months had passed between the crimes and the ruling on the motion to change venue but press coverage had continued and created strong public opinions. *Carr*, 300 Kan. at 68. In *Longoria*, 19 months had

11

passed between the crimes and the ruling on a motion to change venue. Even though a survey revealed 97% of residents still remembered the case, this factor weighed marginally against presuming prejudice because survey respondents did not remember specific details about the case. *Longoria*, 301 Kan. at 508. In *Robinson*, the factor was inconclusive or weighed slightly against a finding of prejudice when more than two years had passed but survey results "showed a high degree of case recognition." *Robinson*, 303 Kan. at 75.

Alexis was killed in March 2018. The juror questionnaires were completed 14 months later, and the trial commenced 7 months after that time. Most of the 100 completed surveys indicated awareness of the case, but the surveys did not inquire about specifics. The time between the killing and the trial was significant. However, there was still a high degree of case recognition 14 months after the killing. This could suggest a neutral result, but Garcia's failure to show the community members remembered specific details about the cases pushes it out of his favor. This factor weighs slightly against finding presumed prejudice.

The next factor is the jury's verdict. The district court did not know the verdict at the time it made its ruling. Garcia argues the ultimate guilty verdict should confirm there was actual prejudice against him.

In *Thurber*, this court concluded the jury's guilty verdict did not "undermine [the defendant's] presumed prejudice claim, but it also [did] not weigh in favor of presumed prejudice." *State v. Thurber*, 308 Kan. 140, 210, 420 P.3d 389 (2018). In *Miller*, this court suggested that an acquittal on some charges may negate presumptive prejudice. *State v. Miller*, 308 Kan. 1119, 1132, 427 P.3d 907 (2018). The caselaw indicates this factor is neutral.

The sixth factor considers the impact of the crime on the community. Garcia argues it is clear there was a significant impact on the community because over 70% of the jury pool had heard about the case, and many had opinions about Garcia's guilt or innocence. He turns to *Miller* for support.

In *Miller*, "a significant percentage" of respondents to a venue study had an opinion on the defendant's guilt 10 years after the crime occurred. 308 Kan. at 1131. This, combined with the extensive publicity around the time of the crime and the retrial, constituted evidence of a great impact on the community. *Miller*, 308 Kan. at 1131. See also *Longoria*, 301 Kan. at 508 (factor weighed in favor of finding prejudice when hundreds of individuals attended a vigil for the victim, social media posts showed strong public sentiment, and nearby newspaper editor testified about high public interest in case); *Robinson*, 303 Kan. at 76 (factor slightly in favor of prejudice when there was little publicity addressing impact of crimes on community but venue study revealed "a high level of case recognition, suggesting the crimes generated interest and were followed by members of the community"); *Carr*, 300 Kan. at 69 (factor favored a finding of prejudice when there was "widespread public reaction to the crime," including increased purchases of home security systems). In *Thurber*, on the other hand, this factor weighed against presumed prejudice when, while the crime shocked the community, "there was no evidence suggesting community members took steps independent of discussing the case with others in the community." *Thurber*, 308 Kan. at 210.

Here, most survey respondents were aware of the Garcia case. Many had heard of the details from friends and acquaintances. One respondent indicated she had made t-shirts in memory of Alexis by request from other community members. These facts, along with the small size of the community, suggest this factor weighs in favor of presuming prejudice.

13

The final factor is the effect of any codefendant's publicized decision to plead guilty. Because there was no co-defendant, this factor is inapplicable.

Our independent legal analysis indicates two factors weigh against presuming prejudice, two factors weigh in favor of presuming prejudice, one factor is neutral, and that the remaining factor weighs marginally against finding prejudice. On balance, this suggests the district court made no error when it denied the motion to change venue. A less mechanical view of the circumstances confirms this result. Before it, the district court had a small community and pervasive recognition of the case among its members. This does not reflect a situation in which "publicity has displaced the judicial process entirely or that the courtroom proceedings more resemble a circus or a lynch mob." *Longoria*, 301 Kan. at 506. Consequently, we conclude the court made no error when it did not presume prejudice and denied Garcia's first and second motions for a venue change.

*Actual Prejudice*

Garcia argues he was entitled to a change of venue because there was actual prejudice amongst the jury. To determine whether actual prejudice existed, "a trial court must 'review the media coverage and the substance of the jurors' statements at voir dire to determine whether a community-wide sentiment exists against the defendant.'" *Longoria*, 301 Kan. at 508 (quoting *Carr*, 300 Kan. 1, Syl. ¶ 6). An appellate court reviews a judge's decision on actual prejudice for an abuse of discretion. *Carr*, 300 Kan. at 75.

Garcia never asked the court to make a ruling of actual prejudice based on voir dire. After voir dire ended and a jury had been selected, the court questioned whether counsel had any concerns. Garcia told the court that "[o]ther than preserving my previous objection before the begin [*sic*] of the venire and my motion to change venue, I have no objection about how this jury was selected." Consequently, the court made no ruling on

14

actual prejudice, leaving no actual prejudice decision for us to review. As a result, Garcia has not preserved a claim of actual prejudice and we do not evaluate it for the first time here. See *Longoria*, 301 Kan. at 509 (defendant failed to preserve actual prejudice claim when he never renewed motion to change venue after voir dire so appellate court had no decision on actual prejudice to review).

We affirm the district court's denial of Garcia's motion to change venue.

*Denial of Venue Study*

Before trial, Garcia requested the court order the State to pay for a venue study that he could use to support his motion to change venue. He asserts the court concluded the study was necessary and ordered BIDS to fund the study, but BIDS declined his request to fund the study. Garcia argues this violated his rights to due process and equal protection of the law under the United States Constitution.

The State argues that the district court neither decided whether the study was necessary nor ordered BIDS to fund it. Instead, the State posits, the court authorized Garcia to seek a study if BIDS agreed to fund it. The State agrees that BIDS declined to fund the study but argues this did not violate Garcia's constitutional rights.

Garcia did not raise his constitutional challenge below. He argues this court may review it because (1) it involves only a question of law arising on proved or admitted facts and is determinative of the case; and (2) consideration of the claim is necessary to serve the ends of justice or prevent the denial of fundamental rights. See *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015).

We decline to consider Garcia's claim for the first time on review. The parties disagree about whether the district court concluded the venue study was necessary, and

15

the record fails to confirm either position. Because this is a central detail supporting Garcia's claim that the venue study was necessary for a full and fair defense, it is critical for our review. Moreover, if this was a BIDS error, we have questions about our jurisdiction to review the state agency's decision on appeal, and the parties have neither identified nor briefed that issue. See K.S.A. 77-606 (Kansas Judicial Review Act provides the exclusive means of judicial review of agency action). Finally, we doubt whether the lack of a venue study affected Garcia's fundamental rights. The record reveals that each juror that was eventually empaneled had indicated they could set aside their opinion to reach a verdict in the case. Because the resolution of this issue requires more factual finding that is outside of our appellate reach, because it may rest on an unbriefed jurisdictional issue, and because it is unlikely Garcia was denied a fundamental right, we will not utilize an exception to address the merits of Garcia's claims.

*Admission of Autopsy Photographs*

Before trial, Garcia offered to stipulate to the cause and manner of Alexis' death and the pathologist's full report. Because he was willing to stipulate to these facts, he asked the district court to prohibit the admission of any photographs of Alexis' body, arguing they were irrelevant and served only to inflame the passions of the jury. The State later indicated it would not accept Garcia's stipulation. The district court overruled Garcia's objection and admitted the photographs. Garcia argues this was error because the photographs were not relevant and were unduly prejudicial. We conclude there was no error.

"When reviewing a district court's decision to admit photographic evidence, an appellate court must first decide if the photographs are relevant." *State v. Morris*, 311 Kan. 483, 492, 463 P.3d 417 (2020) (citing *State v. Seba*, 305 Kan. 185, 213, 380 P.3d 209 [2016]; K.S.A. 60-401[b]). Even if relevant, "a district court may still exclude . . . evidence if the evidence presents a risk of undue prejudice which substantially outweighs

16

its probative value." *Morris*, 311 Kan. at 492 (citing *Seba*, 305 Kan. at 213; K.S.A. 60-445). This court reviews whether the district court should have excluded relevant evidence as prejudicial for an abuse of discretion. *Morris*, 311 Kan. at 492.

"Photographic evidence is relevant . . . if it has a reasonable tendency to prove a material fact in the case." *State v. Williams*, 308 Kan. 1320, 1333, 429 P.3d 201 (2018). "[P]hotographs depicting the extent, nature, and number of wounds inflicted are generally relevant in a murder case, as are photographs which materially assist the jury's understanding of medical testimony" and "aid a pathologist in explaining the cause of death." *State v. Robinson*, 293 Kan. 1002, 1028-29, 270 P.3d 1183 (2012). "[E]ven when the defendant concedes the cause of death, the prosecution has the burden to prove all the elements of the crime charged, including the fact and manner of death and the violent nature of the crime." *Williams*, 308 Kan. at 1334.

Garcia challenges the admission of 14 autopsy photographs. One of these is a photo of Alexis, unclothed from the waist up, that shows bruising and marks on her torso. Nine of the photos show close-up pictures of cuts and bruises on various parts of Alexis' body. Three of the pictures depict close-up views of Alexis' bloodied face. The remaining photo is a close-up picture of the laceration on Alexis' neck. These were all admitted along with the autopsy report during the testimony of Dr. Lyle Noordhoek, the forensic pathologist who conducted the autopsy.

Our caselaw makes it clear the autopsy photographs were relevant. They tended to prove the violent nature of the crime and helped to explain and corroborate the pathologist's testimony and report. See *Robinson*, 293 Kan. at 1028-29; *Williams*, 308 Kan. at 1333. And the extensive nature of Alexis' many wounds, as depicted in the pictures, helped support the State's theory of premeditation. See *State v. Verge*, 272 Kan. 501, 511, 34 P.3d 449 (2001) ("aggravated" number of wounds supported theory of premeditation).

17

Garcia acknowledges this caselaw but implies it is incorrect. He asserts that the State had to prove only the elements of the crime: That Garcia killed Alexis; that the killing was done with premeditation; and that the killing occurred on the specified date. He avers that the State did not have to prove the manner of death or the violent nature of the crime. Garcia also argues that, even if the State must prove cause and manner of death, these photographs were irrelevant because he had been willing to stipulate to the manner and cause of death.

Garcia's arguments are unpersuasive. This court has repeatedly ruled that photographs that support the alleged cause of death and the violent nature of the crime are relevant evidence in a murder trial. See, e.g., *State v. Backus*, 295 Kan. 1003, 1013, 287 P.3d 894 (2012) (quoting *State v. Parker*, 277 Kan. 838, 847, 89 P.3d 622 [2004]); *State v. Green*, 274 Kan. 145, 147, 48 P.3d 1276 (2002) (quoting recitation of "well-established rules" in *State v. Bell*, 273 Kan. 49, 52-53, 41 P.3d 783 [2002]); *State v. Clark*, 261 Kan. 460, 477, 931 P.2d 664 (1997); *State v. Campbell*, 210 Kan. 265, 275, 500 P.2d 21 (1972) ("Where the defendant is charged with a crime of violence, colored slides are relevant and admissible if they tend to establish the violence which was alleged.").

This court has also repeatedly held that the State must prove the manner of death and violent nature of the crime "even when the defendant concedes the cause of death." *Williams*, 308 Kan. at 1334; *Backus*, 295 Kan. at 1012 (quoting *Clark*, 261 Kan. at 477); *State v. Dargatz*, 228 Kan. 322, 329, 614 P.2d 430 (1980); *State v. Henson*, 221 Kan. 635, 647, 562 P.2d 51 (1977); *Campbell*, 210 Kan. at 276. While Garcia's stipulation might have helped satisfy that burden, it would not have made the photographs irrelevant. This court has observed that photographs can depict injuries in a way that a coroner's testimony cannot. *State v. Dupree*, 304 Kan. 43, 65, 371 P.3d 862 (2016). Similarly, the

18

photographs here could depict the violent nature of the crime in a way Garcia's stipulation could not. We conclude the autopsy photographs were relevant.

Garcia argues that even if relevant, these photographs were inadmissible because they were prejudicial to his defense. He asserts they were gruesome and repetitious and, as such, pushed the jury to convict based on emotion.

Garcia's position is uncompelling. The photographs may be difficult to look at, but, as this court has observed, "[g]ruesome crimes result in gruesome photographs." *Williams*, 308 Kan. at 1334 (quoting *Green*, 274 Kan. at 148). And while they are certainly prejudicial to Garcia's case, "[a]ll evidence that is derogatory to the defendant is by its nature prejudicial to the defendant's claim of not guilty." *Clark*, 261 Kan. at 477. The question is whether the evidence is "unduly prejudicial." *State v. Rodriguez*, 295 Kan. 1146, 1157, 289 P.3d 85 (2012). "Photographs are unduly prejudicial . . . when they are unduly repetitious, are particularly gruesome, add nothing to the State's case, and bring about a wrong result." *Clark*, 261 Kan. at 478.

The photographs were not unduly prejudicial. They each show a different part of Alexis' body and were offered to support the pathologist's testimony and report. See *Rodriguez*, 295 Kan. at 1158 (autopsy photographs not unduly prejudicial in part because they were all taken from different angles); *State v. Altum*, 262 Kan. 733, 744, 941 P.2d 1348 (1997) (no undue repetition when five autopsy photographs of child's head showed three distinct depictions). This is different from the unduly prejudicial autopsy photograph in *State v. Boyd*, 216 Kan. 373, 377, 532 P.2d 1064 (1975). There, this court concluded it was error for the trial court to admit a photograph that showed victim "cut open from chin to groin and laid out like a disemboweled beef in a packing plant" and " could be but for a single purpose—to inflame the minds of the members of the jury." *Boyd*, 216 Kan. at 377.

19

We conclude the autopsy photographs were relevant and that the district court did not abuse its discretion in concluding they were not unduly prejudicial.

*Instructional Error*

Garcia argues the district court erred when it declined Garcia's request for an instruction on voluntary manslaughter.

In considering an alleged instructional error, this court first assesses whether it "can or should review the issue, i.e., whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal." *State v. Stafford*, 312 Kan. 577, 581, 477 P.3d 1027 (2020) (quoting *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 [2018]). We then review de novo whether the instruction was legally and factually appropriate. *McLinn*, 307 Kan. at 317. If the defendant requested the instruction below, we reverse any error unless the State shows "there is no reasonable probability the absence of the error would have changed the jury's verdict." *State v. Gentry*, 310 Kan. 715, 720, 449 P.3d 429 (2019).

At the instruction conference, Garcia requested the court instruct the jury on voluntary manslaughter. The court declined. The parties agree that Garcia properly preserved this issue.

Voluntary manslaughter is a lesser included offense of premeditated first-degree murder and thus, legally appropriate in this case. *Gentry*, 310 Kan. at 720-22.

The parties disagree on whether a voluntary manslaughter instruction was factually appropriate. For an instruction to have been factually appropriate, """there must have been evidence that would reasonably justify a conviction of the lesser included crime.""" *Stafford*, 312 Kan. at 584 (quoting *State v. Bernhardt*, 304 Kan. 460, 475, 372

20

P.3d 1161 [2016]). Garcia requested an instruction on voluntary manslaughter under K.S.A. 2018 Supp. 21-5404(a)(1), which is "knowingly killing a human being committed: (1) [u]pon a sudden quarrel or in the heat of passion." This court has explained:

"'"The key elements of voluntary manslaughter . . . are an intentional killing and legally sufficient provocation. When reviewing whether provocation was legally sufficient, an objective test is used. 'Heat of passion' has been defined as 'any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror' based 'on impulse without reflection.' The provocation '"must be sufficient to cause an ordinary man to lose control of his actions and his reason.' . . ."'

. . . .

"'"[I]n order to reduce a homicide from murder to voluntary manslaughter, there must be an adequate provocation that deprives a reasonable person of self-control and causes that person to act out of passion rather than reason. Mere words or gestures, however offensive, do not constitute legally sufficient provocation for a finding of voluntary manslaughter.' State v. Hayes, 299 Kan. 861, 864-66, 327 P.3d 414 (2014).

"'A sudden quarrel can be one form of heat of passion. State v. Johnson, 290 Kan. 1038, 1048, 236 P.3d 517 (2010). "An unforeseen angry altercation, dispute, taunt, or accusation could fall within the definition of heat of passion as sufficient provocation." 290 Kan. at 1048. "'The hallmark of heat of passion is taking action upon impulse without reflection.'" State v. Hilt, 299 Kan. 176, 194, 322 P.3d 367 (2014) (quoting [State v.] Wade, 295 Kan. [916,] 925[,] 287 P.3d 237 [2012]).' [State v.] Brownlee, 302 Kan. [491,] 512-13, 354 P.3d 525 [2015]."'" Bernhardt, 304 Kan. at 476.

Garcia contends the blood throughout the house and the injuries on both Garcia and Alexis, along with the State's theory that Garcia and Alexis were engaged in a "domestic dispute" factually supported the instruction. Garcia asserts that based on this

21

evidence and the State's argument that Garcia killed Alexis because he was angry about Alexis leaving, the jury could have reasonably concluded that there was a sudden quarrel between Garcia and Alexis.

The State concedes there was evidence of a physical fight between Garcia and Alexis, but it argues this is not enough to support the instruction because there is no evidence of a sudden quarrel. It also asserts that the instruction was inappropriate because it contradicted Garcia's testimony that he did not kill Alexis.

We agree with the State; the record is absent any evidence of a sudden quarrel or other form of legally sufficient provocation.

The doctor who treated Garcia at the hospital and a forensic nurse who examined him found swelling and abrasions on Garcia's hands but, apart from the laceration to his neck, found no trauma to any other part of Garcia's body.

In contrast, Alexis had bruises on her face and hands, injuries to her face and lips, and a laceration across her neck. The coroner testified that he believed the hand injuries indicated Alexis had them up to protect herself. He also explained that Alexis had been face down when she died and that her body had been moved since death. He told the jury that Alexis died by homicide through "asphyxia caused by pressure to the face."

This evidence showed that Alexis had been beaten, and there were injuries to Garcia's body. But there was neither evidence nor argument indicating that Alexis had attacked Garcia or that the two were involved in a sudden and mutual physical altercation. In contrast, the physical evidence suggested Garcia had used his fists to beat Alexis while she attempted to defend herself.

22

While there is evidence that Garcia was upset that Alexis was seeking a divorce, Garcia fails to show how this equates to "adequate provocation that deprives a reasonable person of self-control and causes that person to act out of passion rather than reason." *State v. Hayes*, 299 Kan. 861, 866, 327 P.3d 414 (2014). Even if this revelation could cause a reasonable person to "snap" or "experience a break from reality" in some circumstances, it could not legally do so here because Garcia had known Alexis was contemplating divorce for nearly two weeks before Alexis' murder. This court has explained in a similar context that "[a] slow burn is not heat of passion." *State v. Wade*, 295 Kan. 916, 926, 287 P.3d 237 (2012) (victim telling defendant he could not see his son not sufficient provocation for heat of passion instruction because it occurred two days before killing); see also *Hayes*, 299 Kan. at 866 (break up between defendant and victim not legally sufficient provocation for heat of passion killing because it happened days before killing); *State v. Cheeks*, 258 Kan. 581, 591, 908 P.2d 175 (1995) (evidence of marital discord did not support voluntary manslaughter instruction when no evidence victim provoked her killer).

Finally, as the State points out, Garcia's own testimony cuts against the argument that he killed Alexis in the heat of passion; he testified that an intruder killed Alexis and left him for dead after slitting his throat. See *State v. Gallegos*, 313 Kan. 262, 269, 485 P.3d 622 (2021) (voluntary manslaughter instruction not factually appropriate in part because defendant's "claim that he reacted without thinking is subverted by his own testimony").

Instead of pointing to legally sufficient provocation, Garcia simply asserts that the jury could have developed a theory that supported voluntary manslaughter. But this court has said that there must be evidence in the record to support an instruction; it will not "'speculate about hypothetical scenarios.'" *Stafford*, 312 Kan. at 584 (quoting *State v. Story*, 300 Kan. 702, 710, 334 P.3d 297 [2014]). Consequently, a voluntary manslaughter

instruction was not factually appropriate, and the court made no error in denying Garcia's instructional request.

*Cumulative Error*

Garcia argues that, even if the alleged errors alone do not require reversal, their cumulative effect denied him the right to a fair trial and entitles him to a new one.

This court "may reverse when the totality of the circumstances demonstrate that the defendant was substantially prejudiced by cumulative errors and was denied a fair trial." *State v. George*, 311 Kan. 693, 709, 466 P.3d 469 (2020). There must be two or more errors to support a reversal based on cumulative error. *George*, 311 Kan. at 709-10.

Because we have found no errors, this doctrine is inapplicable.

We affirm the district court.