IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,637

STATE OF KANSAS,
*Appellee,*

v.

D.W.,
*Appellant.*

SYLLABUS BY THE COURT

1.

The contemporaneous objection rule under K.S.A. 60-404 requires a party to make a timely and specific objection at trial to preserve an evidentiary challenge for appellate review. The statute has the practical effect of confining a party's appellate arguments to the grounds presented to the district court.

2.

An appellate court reviews the admission of video evidence by first determining whether the challenged evidence is relevant. If the video evidence is relevant, and a challenging party's objection is based on a claim that the video evidence is overly repetitious, gruesome, or inflammatory, i.e., unduly prejudicial, the standard of review is abuse of discretion. The burden of showing an abuse of discretion rests with the party asserting the error.

3.

A sentence is effective when pronounced from the bench, which means a district court generally may not change its mind about a sentence after orally pronouncing it. But

1

the court is not precluded from correcting or clarifying a sentence at the same hearing after misspeaking or miscalculating.

Appeal from Shawnee District Court; CHERYL A. RIOS, judge. Oral argument held December 15, 2023. Opinion filed March 15, 2024. Affirmed.

*Joseph A. Desch*, of Law Office of Joseph A. Desch, of Topeka, argued the cause and was on the brief for appellant.

*Jodi Litfin*, deputy district attorney, argued the cause, and *Michael Kagay*, district attorney, and *Kris W. Kobach*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

WALL, J.:  D.W. sat in the passenger seat of a car while his accomplice in the backseat shot and killed the 16-year-old driver of the car they were pursuing. For his participation in that shooting, a jury convicted D.W. of premeditated first-degree murder and criminal discharge of a firearm at an occupied vehicle. D.W. received a life sentence with no chance of parole for 50 years (often called a "hard 50" sentence), and he now appeals directly to our court. He argues that the district court's decision to admit bodycam footage that showed the victim's dying moments warrants a new trial. He also argues that the district court imposed an illegal sentence by ordering lifetime postrelease supervision on his murder conviction.

We disagree and affirm D.W.'s convictions and sentence. The district court correctly ruled that the bodycam footage was relevant and that the risk of undue prejudice did not substantially outweigh the probative value of the footage. And the record shows that the district court imposed a term of lifetime parole, not lifetime postrelease supervision. That sentence is legal because it conforms with the applicable sentencing statute.

2

FACTS AND PROCEDURAL BACKGROUND

In July 2019, officers responded to reports of a shooting in southeast Topeka. The first officer on the scene found a white car that had veered off the road and come to a stop. Two bystanders were helping a minor in the driver's seat who had been shot in the back of the head; he was later identified as J.M. According to the officer's testimony, J.M. was still breathing and making small noises, but he was not alert. J.M. would later be pronounced dead at the hospital. The officer would also testify that there was blood and matter seeping from J.M.'s head wound. At some point, one bystander said that there had been a gun up front with the driver and that she had placed it on the hood of the car. This graphic scene was captured on the officer's bodycam.

According to the State, D.W. and two others had given pursuit after the victim fired shots into the air and sped off in a car. When the car with D.W. caught up to the victim's car, the backseat passenger fired about 20 rounds from a rifle. Two bullets struck the victim. The State charged D.W. and the two other occupants with premeditated first-degree murder, criminal discharge of a firearm at an occupied vehicle, and first-degree felony murder (i.e., a killing committed during an "inherently dangerous felony," alleged here as the criminal discharge of the firearm). See K.S.A. 2022 Supp. 21-5402(a)(2).

The district court held a four-day jury trial in March 2022. The State presented considerable eyewitness testimony and physical evidence that D.W. was involved in the pursuit and shooting. And D.W. does not challenge that evidence on appeal. At the end of the responding officer's testimony, the State also introduced an abridged version of the officer's bodycam footage. The district court admitted the footage over what it perceived as defense counsel's objection, ruling that the footage was "relevant to the charges in this case" and "more probative than prejudicial." At the beginning of the next day of trial, the defense moved for a mistrial, arguing that the video had no probative value and was

3

introduced solely to inflame the passions of the jury. The district court denied the motion, finding that "[w]hile the video evidence is prejudicial, the Court does find that it is more probative than prejudicial." D.W. did not testify or put on any evidence.

The jury convicted D.W. on all counts. The court sentenced D.W. to a hard 50 for premeditated first-degree murder and 61 months in prison for criminal discharge of a weapon at an occupied vehicle. The court at first said it was imposing lifetime postrelease supervision for the murder conviction, but it quickly clarified that D.W. would be subject to lifetime parole for that conviction and 36 months of postrelease supervision for the firearm conviction. The court ordered the sentences to run concurrent.

D.W. appealed directly to our court. We heard arguments from the parties on December 15, 2023. We have subject-matter jurisdiction over the direct appeal. K.S.A. 2022 Supp. 22-3601(b)(3)-(4) (life sentence and off-grid crimes appeal directly to Kansas Supreme Court).

ANALYSIS

D.W. raises two issues in this appeal. He first argues that the district court erred by admitting the bodycam footage into evidence. Then he argues that the district court imposed an illegal sentence by ordering lifetime postrelease supervision for his first-degree murder conviction. As we explain below, we disagree with both arguments.

I. *The District Court Properly Admitted the Bodycam Footage*

D.W. argues that the bodycam footage was not relevant, that it was unduly prejudicial because it was too gruesome, and that the district court abused its discretion by not personally reviewing the footage before letting the jury see it. The State insists that

4

D.W.'s arguments face preservation obstacles and that, in any event, the footage was relevant and not unduly prejudicial. We address preservation first, then we move to the merits.

Before trial, defense counsel filed a "motion to exclude the admissibility of gruesome photographs," arguing that the court should exclude "gruesome photographs of the decedent [meant to] inflame the passions of the jury." At a pretrial motions hearing, the district court deferred ruling on the motion until and unless D.W. raised it at trial. At trial, defense counsel asked to approach the bench when the State moved to admit the bodycam footage. Defense counsel mentioned the pending pretrial motion and said that "this is a body-cam video, which I'm going to anticipate is going to be pretty graphic." Counsel for the State acknowledged that the footage showed the victim's head wound, but he said the wound was "covered mostly by the shirt or the gauze" and that the video was "relevant" because "it does show [J.M.'s] position in the vehicle" and that "he's been injured." The court admitted the video, ruling that the footage was "relevant to the charges in this case" and "more probative than prejudicial."

Under the contemporaneous-objection rule codified at K.S.A. 60-404, a party must make a timely and specific objection at trial to preserve an evidentiary challenge for appellate review. That rule has the practical effect of confining a party's appellate arguments to the grounds presented to the district court. *State v. Scheetz*, 318 Kan. ___, Syl. ¶ 1, 541 P.3d 79, 82 (2024). The State contends that the only contemporaneous objection that D.W. lodged at trial was that the video was unduly prejudicial because it was too gruesome. So in its view, the relevance of the footage is not a question properly before us.

We disagree. In *State v. Randle*, 311 Kan. 468, 480, 462 P.3d 624 (2020), another appeal addressing the admission of a crime-scene video, we held that defense counsel's objections were preserved despite misstating the specific grounds for the objection and

saying only that he would like to "'renew [his] antemortem objection,'" which referred to a motion addressing only pre-death photos of the victim. But under the facts of that case, the district court "knew the issue associated with the video and had the opportunity to rule on it," so we held that "the purposes of the contemporaneous objection rule under K.S.A. 60-404 were fulfilled." 311 Kan. at 480. The facts here also show that the contemporaneous-objection rule was satisfied. There was a pending motion to exclude the footage as overly gruesome, the State argued relevance when defense counsel objected at trial, and the district court ruled on relevance and undue prejudice. We will therefore address the merits of D.W.'s arguments.

When reviewing a district court's decision to admit video evidence, an appellate court first determines whether the evidence is relevant. 311 Kan. at 478. To be relevant, evidence must be material and probative. Evidence is material when the fact it supports is disputed or at issue in the case. Evidence is probative if it tends to prove a material fact. *State v. Shields*, 315 Kan. 814, 831, 511 P.3d 931 (2022). D.W. argues that there was no dispute about how J.M. had been killed or who had shot him—he was shot and killed by the backseat passenger with the rifle. So in his view, nothing in the video was material to "the only issue in dispute at trial"—whether D.W. had "criminal responsibility as an aider and/or abettor" for the actions of the codefendants.

D.W. is incorrect. The State "had the burden to prove beyond a reasonable doubt all elements of the crime charged, including the fact and manner of the death and its violent nature, even if those limited aspects of the case were undisputed." *Randle*, 311 Kan. at 479. Because the State did not admit any autopsy photos, the footage was the only visual evidence showing the nature and location of the fatal injury. And because the video showed the vehicle was occupied and a weapon was discharged into it, the footage also established elements of the unlawful-discharge-of-a-firearm charge (and thus the felony-murder charge). See K.S.A. 2022 Supp. 21-6308(a)(1)(B) (defining criminal discharge of a firearm as the "reckless and unauthorized discharge of any firearm at . . . a

6

motor vehicle in which there is a human being"). Moreover, in the video, the bystander helping the officer render aid to J.M. says that she picked a gun up from the driver's side floor and placed it on the hood. That statement supports the State's theory that J.M. initially fired shots out of his car and sped off, which initiated the pursuit and retaliation. The district court properly ruled that the footage is relevant.

After an appellate court decides the challenged video is relevant, it then considers whether the district court still abused its discretion by admitting the evidence because its probative value is substantially outweighed by the risk of undue prejudice. See K.S.A. 60-445 (granting trial court discretion to exclude otherwise relevant evidence if its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party). A video may be unduly prejudicial when it is too repetitious, particularly gruesome, or inflammatory. The burden of showing an abuse of discretion rests with the party asserting the error. See *Shields*, 315 Kan. at 832.

D.W. argues that the bodycam footage was unduly prejudicial because it was a "gruesome depiction of the victim as he was dying." We have reviewed the bodycam footage, and there is no doubt it is graphic. But unless the State presents "gruesome evidence simply to inflame the jury," there is no error. *Randle*, 311 Kan. at 479. After all, "[g]ruesome crimes result in gruesome photographs." 311 Kan. at 479. And because the State did not introduce autopsy photos, the footage was the only visual evidence showing the cause and manner of J.M.'s death. The State also significantly cut down the footage—the video shows the officer in J.M.'s car for about two minutes, and—while there is quite a bit of blood—the wound is visible only for a few seconds. Given the relevance of the footage and the State's efforts to minimize undue prejudice by editing the video and not admitting potentially cumulative autopsy photos, we cannot conclude that the State presented the footage simply to inflame the jury.

7

Finally, we also disagree with D.W. that a district court per se abuses its discretion when it admits a gruesome video before personally reviewing its contents. District courts regularly and properly rely on a party's proffer about what is depicted in photographs or videos. That is especially true when, as here, the objection is lodged in the midst of trial and on the brink of showing the video to the jury. Granted, it may have been better practice to review the video outside the jury's presence before ruling on its admissibility. See, e.g., 311 Kan. at 479 ("In Randle's case, the court reviewed all 128 autopsy photographs before admitting the eight."); *State v. Tague*, 296 Kan. 993, 1003, 298 P.3d 273 (2013) ("The trial judge examined all the photographs and noted that some of the photographs depicted the victim's body and wounds but noted 'there is no particular significant blood shown.'"). But D.W. has cited no authority suggesting that such a practice is compulsory or that the failure to employ it constitutes error per se. Thus, he has failed to demonstrate error and we affirm the district court's evidentiary ruling.

## II. *D.W. Has Not Established That He Is Serving an Illegal Sentence*

District courts lack statutory authority to impose lifetime postrelease supervision when imposing an off-grid indeterminate life sentence for a first-degree murder. See, e.g., *State v. Newman*, 311 Kan. 155, 160, 457 P.3d 923 (2020). Such sentences are illegal because they fail to conform to the applicable statutory provision. K.S.A. 2022 Supp. 22-3504(c)(1) (defining "illegal sentence"). D.W. received an off-grid indeterminate life sentence for first-degree murder, but he insists that the district court also imposed lifetime postrelease supervision for that crime. He therefore asks us to vacate that portion of his sentence. See K.S.A. 2022 Supp. 22-3504(a) ("The court may correct an illegal sentence at any time while the defendant is serving such sentence.").

A sentence is effective when pronounced from the bench, which means a district court generally may not change its mind about a sentence after orally pronouncing it. See *State v. Howard*, 287 Kan. 686, 694-95, 198 P.3d 146 (2008). But that does not mean that

the court is precluded from correcting or clarifying a sentence at the same hearing after misspeaking or miscalculating. 287 Kan. at 694-95. And the record here shows that the district court misspoke and never intended to impose lifetime postrelease supervision for D.W.'s off-grid conviction for premeditated first-degree murder.

At sentencing, the court initially said it was imposing "post release . . . for the period of your lifetime" for D.W.'s murder conviction and 36 months of postrelease supervision for his criminal-discharge-of-a-weapon conviction. But it quickly sought to "clarify the sentence," saying that it was imposing "life without the possibility of parole before 50 years" on the murder conviction and 36 months of postrelease supervision on the firearms conviction:

> "For Count 3 there would be a 36-month period of post release. For Count 1, the post release would be for the period of your lifetime. You shall receive credit for time served as provided by law, and you can—well I've already indicated the good time.

> "The Court does make a deadly weapon finding as to Counts 1, 2, and 3. You're directed to register as a violent offender for [a] period of 15 years. You're directed to submit to DNA testing based upon this conviction. You're also prohibited from carrying a firearm based upon this conviction.

> "The Court would direct that you pay court costs in the amount of $171, a $22 surcharge fee, and a $200 DNA database fee. The Court would waive the BIDS application fee and the attorney fee for indigency found.

> "Let me clarify the sentence. In Count 1, your sentence would be a term of life without the possibility of parole before 50 years. For Count 2 [sic], which is concurrent, the term would be 61 months with Kansas Secretary of Corrections, 15 percent good time, 36-month[s] post release. If I wasn't clear on that before, I apologize."

9

The journal entry also reflected this clarified sentence—that the court imposed a term of lifetime parole for the premeditated first-degree murder conviction. See *State v. Jackson*, 291 Kan. 34, 36, 238 P.3d 246 (2010) (appellate court may rely on journal entry that "clarifies an ambiguous or poorly articulated sentence pronounced from the bench"), *abrogated on other grounds by State v. Marinelli*, 307 Kan. 768, 415 P.3d 405 (2018). As a result, we conclude that the district court did not impose lifetime postrelease supervision and then improperly modify D.W.'s sentence.

D.W. also asserts in passing that even the clarified sentence is illegal because it includes a term of postrelease supervision. The district court imposed a 61-month sentence with 36 months of postrelease supervision for D.W.'s criminal-discharge-of-a-firearm conviction (an on-grid offense), and the court ran that sentence concurrent to the indeterminate life sentence it imposed for first-degree murder (an off-grid offense). We read D.W.'s passing comment to assert that a district court lacks authority to impose a term of postrelease supervision for an on-grid conviction that runs concurrent to an indeterminate life sentence for an off-grid conviction. That is an issue we have not addressed before.

We acknowledge that there may be something incongruent about imposing a term of postrelease supervision concurrent to an indefinite life sentence for the off-grid crime of premeditated first-degree murder. That sentence consists of a mandatory term of imprisonment followed by parole eligibility, meaning that if the defendant "ever leaves prison it will be because the successor to the parole board has granted [the prisoner] parole, not because the sentencing court ordered postrelease supervision." *State v. Cash*, 293 Kan. 326, 330, 263 P.3d 786 (2011). And because "the terms 'parole' and 'postrelease' have separate meanings," it is not immediately clear how a term of postrelease supervision could run concurrent to lifetime parole. 293 Kan. at 330.

But D.W. does not develop his argument beyond his single-sentence assertion that the sentence is illegal because it includes a term of postrelease supervision. He does not explain why such a sentence would fail to "conform to the applicable statutory provision." K.S.A. 2022 Supp. 22-3504(c)(1). Nor does he cite any of the many statutes or appellate decisions that address parole and postrelease supervision. Points raised only incidentally and not adequately briefed are considered abandoned. *State v. Meggerson*, 312 Kan. 238, 246, 474 P.3d 761 (2020). As a result, we conclude that D.W. has waived this illegal-sentence claim.

Affirmed.