IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 127,299

STATE OF KANSAS,
*Appellee,*

v.

KYLE ROMEY,
*Appellant.*

SYLLABUS BY THE COURT

1.

Premeditation exists when the intent to kill arises before the act takes place and is accompanied by reflection, some form of cognitive review, deliberation, or conscious pondering. Premeditation requires more than mere impulse, aim, purpose, or objective. It requires a period, however brief, of thoughtful, conscious reflection and pondering— done before the final act of killing—that is sufficient to allow the actor to change his or her mind and abandon his or her previous impulsive intentions.

2.

A defendant is not entitled to present nonrelevant evidence supporting a theory of defense at trial.

3.

When giving a *Bernhardt* instruction clarifying the temporal aspect of premeditation, the court must also give a *Stanley* instruction with this language: Premeditation requires more than mere impulse, aim, purpose, or objective. It requires a

period, however brief, of thoughtful, conscious reflection and pondering—done before the final act of killing—that is sufficient to allow the actor to change his or her mind and abandon his or her previous impulsive intentions.

4.

A voluntary manslaughter instruction under K.S.A. 21-5404(a)(1) for a killing done upon a "sudden quarrel or in the heat of passion" requires some objective evidence of sufficient provocation. Whether sufficient provocation exists requires an objective determination of whether a reasonable person would lose self-control under the facts presented such that the person acts from extreme emotion rather than reason, regardless of the subjective belief of the defendant.

5.

Unpreserved instructional issues that are not clearly erroneous may not be aggregated in a cumulative error analysis because K.S.A. 22-3414(3) limits a party's ability to claim them as error.

6.

La. Stat. Ann. § 14:79 is not comparable to K.S.A. 21-5924 under the identical-to-or-narrower standard in *State v. Wetrich*, 307 Kan. 552, 562, 412 P.3d 984 (2018).

7.

Appellate courts generally will not consider issues raised for the first time in a supplemental brief.

Appeal from Sedgwick District Court; ERIC N. WILLIAMS, judge. Oral argument held May 12, 2025. Opinion filed December 5, 2025. Conviction affirmed, sentence vacated, and case remanded with directions.

2

*Grace E. Tran*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Boyd K. Isherwood*, deputy district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

WALL, J.: One morning in October 2021, Kyle Romey appeared at his sister's house. He asked her to go to the trailer home he shared with their mother. On the drive, his sister noticed that Romey's hand was swollen, like he had been punching something. Romey admitted that he had "hurt Mama . . . bad" and said that he would be going to prison. When they arrived, their mother lay dead on the floor. There was broken furniture and blood throughout the home, and their mother had extensive blunt-force injuries.

A jury convicted Romey of first-degree premeditated murder. The district court imposed a life sentence with no opportunity for parole for more than 54 years.

Romey now appeals that conviction. He argues that there was insufficient evidence of premeditation and raises several other alleged trial errors. But after careful review, we find no error that warrants reversal and affirm his conviction.

Romey also challenges his sentence—both his criminal-history score and the court's award of jail-credit. Romey argues that the district court should have calculated his criminal-history score as B rather than A. Though Romey received a life sentence, this change would reduce the mandatory-minimum prison term he must serve before becoming eligible for parole. We agree with Romey on this point. The court should not have included three criminal-threat convictions and a Louisiana misdemeanor conviction

3

when calculating his criminal history. We therefore remand for resentencing. As to the jail-credit issue, Romey first raised this challenge in a supplemental brief, so we conclude that this issue is not properly before us.

## FACTS AND PROCEDURAL BACKGROUND

When Romey arrived that morning at his sister's house, he at first appeared calm and composed. But his demeanor changed dramatically after his sister's fiancé left. Romey began to cry, told his sister he needed a hug, and said it would be "the last time he would be able to hold [her]." Before leaving for their mother's house, Romey's sister saw him "drink a bong water," meaning that he drank the water in a smoking apparatus that meth smoke is drawn through. Romey's sister explained that this water would have "enormous amounts" of the narcotic in it. He also smoked meth from a pipe that he had brought.

When they entered the trailer, Romey's sister found their mother's lifeless body on the floor. There was broken furniture and blood throughout. Romey said that he had awoken after blacking out and had found their mother on the floor taking her last breaths. He said that she had asked for vodka, but he gave her water instead. Romey also said that he could not remember what had happened.

Romey approached their mother's body, lay down beside her, and said: "Mama, I told you I would bring Mandy. . . . She's here." He then covered their mother with a blanket and remained lying next to her. When his sister tried to call 911, Romey knocked the phone from her hands and said that he was not ready yet. When they eventually left the trailer, Romey directed his sister to return to her house. His sister was eventually able to call 911, and she reported that Romey had told her that he killed their mother.

4

Police found and arrested Romey early that afternoon. After his arrest, Romey invoked his right to remain silent and did not provide a statement to police. A nurse who examined him at the hospital that night documented numerous abrasions across his body and took a blood sample that was sent to law enforcement. This sample would later show the presence of amphetamine and methamphetamine in Romey's system.

Investigators recovered two potential weapons from the trailer: an orange knife with a glass breaker and a hammer from behind the bed in the primary bedroom. The knife and hammer had blood on them. The knife had DNA consistent with that of Romey, and the hammer had DNA consistent with that of both Romey and his mother.

The medical examiner performed an autopsy of Romey's mother. He found extensive scrapes, cuts, and bruises on her body, from head to legs. She had two skull fractures, numerous fractured ribs, and a fractured bone in her right elbow. The medical examiner concluded that Romey's mother had died from blunt force trauma, with heart disease and an enlarged heart contributing to her death. Based on the number and distribution of injuries, the examiner determined that her injuries could not have resulted from a single impact. He could not say whether any weapon caused specific wounds, but he testified that one skull fracture was consistent with the use of a weapon.

At trial, defense counsel tried to introduce a video of Romey's erratic post-arrest behavior and the lab results that showed drugs in his system that day. The district court excluded this evidence as irrelevant, citing the time gap between the mother's death and Romey's arrest and evidence that Romey consumed drugs during that interval.

The court instructed the jury on first-degree premeditated murder and three lesser included offenses: second-degree intentional murder, second-degree reckless murder, and involuntary manslaughter. Over Romey's objection, the district court gave a *Bernhardt* instruction when explaining premeditation. That instruction generally explains

5

that premeditation can form during or after an initial altercation. See *State v. Bernhardt*, 304 Kan. 460, 472, 372 P.3d 1161 (2016). The court also instructed the jury on voluntary intoxication. But it denied Romey's request to instruct the jury on heat-of-passion or sudden-quarrel voluntary manslaughter, reasoning that the evidence didn't support them.

The jury convicted Romey of first-degree premeditated murder. The court sentenced him to life imprisonment without the possibility of parole for 653 months. See K.S.A. 21-6620(c)(1)(B) (providing that when defendant's criminal-history classification would result in presumptive imprisonment range exceeding 50 years for severity level 1 crime, mandatory minimum must match that range).

Romey appealed directly to our court. He has a statutory right to appeal the judgment against him in the district court. See K.S.A. 22-3602(a). And that appeal comes directly to us because the district court imposed a life sentence and because Romey was convicted of an "off-grid" crime, meaning his sentence was not imposed under the grids that set out the presumptive sentences for most felonies. See K.S.A. 22-3601(b)(3)-(4). We heard oral argument on May 12, 2025.

Romey moved for supplemental briefing shortly before oral argument. We denied that motion. Then Romey renewed his request after argument. He argued that he was entitled to additional jail credit under *State v. Ervin*, 320 Kan. 287, 311, 566 P.3d 481 (2025), which we decided after briefing closed. We granted the motion and ordered the parties to address whether the jail-credit issue was properly before us.

ANALYSIS

Romey raises several challenges to his first-degree premeditated murder conviction. He contends the State presented insufficient evidence of premeditation. He argues the district court violated his right to present a defense by excluding evidence of

6

his drug use. He also claims the court committed two jury-instruction errors: failing to provide sufficiently thorough instructions on premeditation and erroneously refusing his requested voluntary-manslaughter instruction. Finally, he argues that the cumulative effect of these trial errors deprived him of a fair trial.

We address these challenges first. Though the record before us lacks some elements commonly associated with premeditation, the State presented evidence from which a rational juror could infer that Romey engaged in thoughtful reflection before killing his mother. Specifically, the evidence showed that Romey switched methods of attack during an extended struggle.

Romey's other challenges to his conviction are largely unpersuasive. But we conclude that the district court should have given a supplemental instruction on premeditation based on our decision in *State v. Stanley*, 312 Kan. 557, 478 P.3d 324 (2020). But Romey did not request that instruction at trial. So his conviction stands unless Romey firmly convinces us that the jury's verdict would have been different had the district court given the instruction. He fails to make that showing. And we affirm his murder conviction.

After addressing Romey's challenges to his conviction, we evaluate his illegal-sentence claim. He argues that his sentence is illegal because the district court improperly calculated his criminal history. He contends that his history should be based on only two prior "person" felonies, not the six that the court relied on. On this point, we agree with Romey. The district court improperly included three Kansas criminal-threat convictions and a Louisiana conviction for violating a protective order. So we remand for resentencing.

Finally, we address the jail-credit issue that Romey raised in his supplemental brief. He argues that he is entitled to additional jail credit based on our recent decision in

7

*Ervin*. But *Ervin* was not a change in law—it applied existing caselaw to a different scenario. Romey knew or should have known about that caselaw before he filed his initial brief. His failure to raise this issue there renders it unpreserved.

I. *The State presented sufficient evidence of premeditation.*

Romey was convicted of first-degree murder under K.S.A. 2021 Supp. 21-5402(a) for killing his mother "intentionally" and with "premeditation." He does not dispute that the killing was intentional. He instead argues that the State presented insufficient evidence of premeditation.

Our approach to sufficiency challenges is well settled. When a defendant exercises the right to a jury trial, the jury—not an appellate court—weighs the evidence, judges witness credibility, and determines questions of fact. See *State v. Dotson*, 319 Kan. 32, 37, 551 P.3d 1272 (2024). When the jury convicts and the defendant challenges the sufficiency of evidence on appeal, an appellate court must defer to the jury's factual findings. We do so by reviewing the evidence in the light most favorable to the State. 319 Kan. at 37. Under this standard, we must affirm the conviction if a rational juror could have found the defendant guilty beyond a reasonable doubt. 319 Kan. at 37. The question for us, then, is whether a rational fact-finder could have concluded that Romey acted with premeditation.

Our court thoroughly examined premeditation in *Stanley*. Premeditation exists when the intent to kill "arises before the act takes place and is accompanied by reflection, some form of cognitive review (i.e., 'thinking over'), deliberation, conscious pondering." *Stanley*, 312 Kan. at 572.

> "Premeditation requires more than mere impulse, aim, purpose, or objective. It requires a
> period, however brief, of thoughtful, conscious reflection and pondering—done before

8

the final act of killing—that is sufficient to allow the actor to change his or her mind and abandon his or her previous impulsive intentions." 312 Kan. at 574.

Premeditation thus consists of two components: a temporal component (the intent must arise before the act) and a cognitive component (consideration). See *State v. Coleman*, 318 Kan. 296, Syl. ¶ 1, 543 P.3d 61 (2024).

Occasionally, the State may offer direct evidence of premeditation—for example, a defendant might confess to planning the killing in advance. But more often, the State tries to prove premeditation with circumstantial evidence. *Dotson*, 319 Kan. at 38. In those cases, the jury may infer premeditation from the case-specific circumstances, provided the inference is reasonable. 319 Kan. at 38.

But rather than examine whether the direct or circumstantial evidence establishes the two components of premeditation, Romey and the State structure their arguments around five factors our court has often considered when evaluating circumstantial evidence of premeditation. See *Dotson*, 319 Kan. at 38. Those factors are (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. 319 Kan. at 38.

Romey contends that "none of these factors point to premeditation." The State responds that "[t]he analysis . . . is not driven by the number of factors present in a particular case because in some cases one factor alone may be compelling evidence of premeditation." In reply, Romey criticizes the State for advancing an argument that "is not one of the factors that this Court has indicated can be used to support an inference of premeditation."

9

We pause to reiterate what we said in *Dotson*. While the factors might provide helpful guidance in certain cases, they merely illustrate a broader principle—that jurors may infer premeditation from case-specific circumstances. As we made clear in *Dotson*, appellate courts and parties should neither apply these factors mechanically nor treat them as mandatory elements of the analysis. 319 Kan. at 38. The decisive question in reviewing the sufficiency of premeditation evidence is not whether certain enumerated factors appear in the record. Rather, we must determine "whether a rational juror could have found beyond a reasonable doubt that the case-specific circumstances, viewed in a light most favorable to the State, established the temporal and cognitive components of premeditation." 319 Kan. at 38-39.

The evidence here supports that conclusion. When viewed with the required deference to the State, the circumstantial evidence shows that a rational juror could infer that Romey engaged in thoughtful reflection before killing his mother. The evidence was therefore sufficient to establish premeditation.

The evidence shows that Romey's mother sustained wounds to virtually every part of her body from her head to her legs, including two skull fractures, several rib fractures, and an elbow fracture. The evidence also shows blood and broken furniture scattered throughout the trailer. From this evidence, it is reasonable to infer that an extended assault occurred. Such an assault would have provided Romey with time to reflect before delivering the lethal blows, thus satisfying the temporal component of premeditation.

But the temporal component alone is insufficient. Showing that Romey had the opportunity for reflection does not establish that he engaged in the necessary reflection. See *Coleman*, 318 Kan. at 304 (prosecutor's claim that "'[t]ime to have thought the matter over beforehand'" is sufficient to establish premeditation "negated the concept of conscious reflection" and thus "misstated the law"). There must be evidence of the cognitive component.

10

The circumstantial evidence supports that inference too. Romey's sister testified that on the morning in question, one of his hands "was swollen as if he had been punching something," and forensic examination confirmed swelling on his right hand. This swelling suggests Romey used his fist during the attack. The evidence also points to his use of weapons: investigators recovered a hammer bearing both Romey's and his mother's DNA and a knife with a glass breaker containing Romey's DNA, and both tested presumptively positive for blood. Though the medical examiner did not connect specific injuries to these items, he did testify that one skull fracture was consistent with the use of a weapon. A rational juror could reasonably infer from the blood evidence, DNA findings, the medical examiner's testimony, and the victim's numerous blunt-force injuries that Romey used at least one of these weapons during the attack.

This apparent shift between methods of attack—from using his hands to wielding weapons, or vice versa—suggests more than just an opportunity for reflection. Such a transition required Romey to pause, however briefly, select a different means of assault, and consciously continue the attack. A rational juror could infer from this sequence that Romey engaged in the cognitive process of reflection before killing his mother, thus satisfying the cognitive component of premeditation.

We acknowledge that this case does not present the strongest evidence of premeditation. The record does not include circumstances that could more clearly indicate premeditation, such as planning, motive, or prior threats. But sufficiency review does not require the State to present the most compelling evidence possible. It requires only evidence, viewed in the light most favorable to the State, that would enable a rational juror to find the defendant guilty beyond reasonable doubt. The case-specific evidence of an extended assault involving multiple methods of attack meets that standard. We therefore conclude that the State presented sufficient evidence of premeditation to support Romey's conviction.

II. *The district court correctly excluded post-arrest footage and a lab report because they were not probative as to whether Romey was intoxicated when he killed his mother.*

Romey raised a voluntary-intoxication defense at trial. Defendants who rely on this defense contend that their level of intoxication caused their mental faculties to be so impaired that they could not form the intent necessary to commit the crime. See *State v. Morris*, 311 Kan. 483, 490, 463 P.3d 417 (2020). To support this defense, Romey tried to introduce video footage showing his erratic post-arrest behavior and lab results confirming amphetamine and methamphetamine in his system on the day of the killing. The district court excluded this evidence as legally irrelevant. It cited the time gap between his mother's death and his arrest and evidence that Romey had used drugs during that interval. We agree with the district court's ruling.

A criminal defendant has a federal and state constitutional right to present relevant, admissible, and noncumulative evidence that is integral to the theory of their defense. *State v. Robinson*, 306 Kan. 431, 436, 394 P.3d 868 (2017). The dispute here is whether the video and lab report were relevant. To be relevant in the legal sense, "evidence must be material and probative. Evidence is material when the fact it supports is disputed or at issue in the case. Evidence is probative if it tends to prove a material fact." *State v. D.W.*, 318 Kan. 575, 579, 545 P.3d 26 (2024). We review materiality rulings independently, without giving deference to the district court. But we review probative-value rulings for abuse of discretion. *State v. Alfaro-Valleda*, 314 Kan. 526, 533, 502 P.3d 66 (2022).

Romey argues that both pieces of evidence were probative of his intoxication when his mother died. He points to a constellation of facts admitted during trial suggesting his impaired state:  his reported "blackout" before the killing; his erratic behavior at his sister's house that morning; and his pattern of methamphetamine use

12

during the relevant period. In Romey's view, the excluded evidence formed an essential part of this larger picture. Without it, he contends, the jury lacked critical information that it needed to assess his mental state at the time of the killing.

But the timeline here breaks any meaningful connection between the excluded evidence and Romey's mental state during the killing. Romey's mother died around 6 a.m. He arrived at his sister's house by 8:30 a.m. He was not arrested until 1:30 p.m. And his blood was drawn at 6:30 p.m. During the seven hours between the killing and his arrest, Romey smoked meth and drank what his sister described as "bong water" containing "enormous amounts" of meth. This drug use severs the logical link between his post-arrest condition and his mental state when the killing occurred. And the lab report would merely confirm this later drug use. Neither piece of evidence is probative because neither tends to prove the material fact of his condition hours earlier, before he consumed these drugs. So the district court did not abuse its discretion by excluding this evidence.

III. *The district court should have given a* Stanley *instruction, but we are not firmly convinced the verdict would have changed.*

The district court instructed the jury using the standard pattern language on premeditation: that it "means to have thought the matter over beforehand" and "requires more than the instantaneous, intentional act of taking another's life." See PIK Crim. 4th 54.150 (2020 Supp.). The court also gave a *Bernhardt* instruction. This supplemental language informed jurors that premeditation need "'not have to be present before a fight, quarrel or struggle begins,'" need "'not necessarily mean that an act is planned, contrived, or schemed beforehand,'" and could "'occur during the middle of a violent episode, struggle, or fight.'" *Bernhardt*, 304 Kan. at 464.

Romey contends that the district court was required to give a *Stanley* instruction alongside the *Bernhardt* instruction. A *Stanley* instruction tells jurors that

"[p]remeditation requires more than mere impulse, aim, purpose, or objective. It requires a period, however brief, of thoughtful, conscious reflection and pondering—done before the final act of killing—that is sufficient to allow the actor to change his or her mind and abandon his or her previous impulsive intentions." *Stanley*, 312 Kan. at 574.

When a party alleges that an instruction should have been given, there are two parts to the error analysis. We first assess whether the instruction was legally and factually appropriate. *State v. Holley*, 313 Kan. 249, 254-55, 485 P.3d 614 (2021). If so, we also consider whether the instructions given properly and fairly stated the law and were not reasonably likely to mislead the jury. *Dotson*, 319 Kan. at 51-52. If we find error, we assess whether it requires us to reverse defendant's conviction. We use the applicable harmless-error test if the party requested the instruction below. 313 Kan. at 256-57. We apply the clear-error test if they did not. See K.S.A. 22-3414(3); *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021).

The State does not dispute that a *Stanley* instruction would have been legally and factually appropriate here. But the law doesn't require the district court to give all legally and factually appropriate instructions. And we have refused to find instructional error when the instructions given "'properly and fairly stated the law and were not reasonably likely to mislead the jury,'" even if another instruction might have been clearer or more thorough in retrospect. *Dotson*, 319 Kan. at 51-52; *State v. Hilyard*, 316 Kan. 326, 332-36, 515 P.3d 267 (2022). The State contends that the instructions given meet this standard. It also insists that our court has never required a *Stanley* instruction when a court uses a *Bernhardt* instruction—it's just a "best practice." But we disagree with the State on both points.

First, a *Stanley* instruction is required when the district court provides a *Bernhardt* instruction. Although *Stanley* at one point characterizes its supplemental instructional

14

language as a "best practice," it explicitly declares that the instruction is mandatory when a *Bernhardt* instruction is given: "When giving an instruction clarifying the temporal aspect of premeditation, the court *must* also instruct the jury with this language." (Emphasis added.) *Stanley*, 312 Kan. 557, Syl. ¶ 7.

Second, we disagree that a *Bernhardt* instruction, standing alone, adequately states the law of premeditation without potential juror confusion. In *Stanley*, our court directly confronted the "colorable" claim that under its then-existing precedent, "as juries receive clarifying instructions on premeditation," like a *Bernhardt* instruction, "there is potential for a new confusion to emerge—i.e., what is the difference, if any, between premeditation and intent?" 312 Kan. at 568. We observed that such clarifying instructions potentially "blurr[ed] . . . the distinction between premeditation and intent." 312 Kan. at 569. This recognition prompted an "extended explanation" of the difference between the two mental states. 312 Kan. at 568-74.

Despite believing that "everyone—including every juror—[would] instinctively understand" the difference between intent and premeditation, we emphasized the importance of clarifying that difference to jurors by defining the temporal and cognitive components of premeditation. 312 Kan. at 573-74. And we drafted supplemental language to that end precisely because "these fine distinctions could be lost on juries deliberating on the differences between intentional and premeditated acts." 312 Kan. at 574. In short, without a *Stanley* instruction, a *Bernhardt* instruction does not "properly and fairly" state the law and may be "reasonably likely to mislead the jury." We therefore conclude that the district court should have added the *Stanley* instruction.

But because defense counsel failed to request a *Stanley* instruction after the State received its requested *Bernhardt* instruction, Romey now faces the steep hurdle of clear-

15

error review. See K.S.A. 22-3414(3). To secure relief, he must firmly convince us that the jury would have reached a different verdict had the *Stanley* instruction been given. See *Dotson*, 319 Kan. at 53. He cannot meet this standard.

The *Stanley* instruction would have emphasized that premeditation requires "thoughtful, conscious reflection and pondering" sufficient to permit abandonment of impulsive intentions. But as we detailed above, the State presented sufficient evidence of thoughtful reflection before the killing. The jury also declined to convict Romey on the lesser included offenses of second-degree intentional murder, second-degree reckless murder, and involuntary manslaughter. We are not firmly convinced that more thorough premeditation instructions would have led jurors to abandon a verdict supported by sufficient evidence and instead convict Romey of a lesser offense they already had the option to choose.

IV. *A voluntary manslaughter instruction was not factually appropriate because there was no evidence of legally sufficient provocation.*

Romey next argues that the district court erred when it denied his request for an instruction on voluntary manslaughter committed "upon a sudden quarrel or in the heat of passion." See K.S.A. 21-5404(a)(1). The offense has two essential elements:  "knowingly killing" a person based on "'legally sufficient provocation.'" K.S.A. 21-5404(a)(1); *State v. Garcia*, 315 Kan. 366, 382, 508 P.3d 394 (2022). Such provocation must be substantial enough to cause an ordinary person to lose control of their actions and reason. 315 Kan. at 382.

The parties agree that the instruction was legally appropriate because voluntary manslaughter is a lesser included offense of first-degree murder. See *State v. Gentry*, 310 Kan. 715, 722, 449 P.3d 429 (2019); K.S.A. 22-3414(3) ("In cases where there is some evidence which would reasonably justify a conviction of some lesser included crime . . .

16

the judge shall instruct the jury as to the crime charged and any such lesser included crime."). The dispute instead centers on the factual appropriateness of the instruction.

The question for us, then, is whether there is some evidence, viewed in the light most favorable to Romey, of legally sufficient provocation. See *State v. Thille*, 320 Kan. 435, Syl. ¶ 2, 570 P.3d 18 (2025). "Whether sufficient provocation exists requires an objective determination of whether a reasonable person would lose self-control under the facts presented such that the person acts from extreme emotion rather than reason, regardless of the subjective belief of the defendant." 320 Kan. 435, Syl. ¶ 3.

Romey points to evidence that his mother's trailer was in disarray, with broken furniture and items scattered about, and that both he and his mother had injuries. In his view, this shows that a fight broke out, causing the destruction and resulting in what could be interpreted as defensive wounds on his body.

We are not persuaded. This evidence may show that an extended struggle occurred, but it does not meet the objective standard for legally sufficient provocation. The record contains no evidence suggesting that Romey's mother provoked the attack. Romey did not testify about the events, and nothing about the disarray or his injuries supports such an inference. In fact, Romey's counsel argued throughout the trial that some third party—not Romey's mother—may have inflicted his injuries, knocked him unconscious, and then killed her. Romey has thus failed to show that a voluntary-manslaughter instruction was factually appropriate. The district court did not err by refusing to give it.

V. *The cumulative-error doctrine does not apply.*

Romey's final challenge to his conviction rests on the cumulative-error doctrine. Under that doctrine, the cumulative effect of trial errors may require reversal even when

17

individual errors do not. Reversal is appropriate when the totality of the circumstances establishes that the defendant was substantially prejudiced by the errors and denied a fair trial. See, e.g., *State v. Taylor*, 314 Kan. 166, 172-77, 496 P.3d 526 (2021).

The cumulative-error doctrine does not apply because we found no cognizable trial errors. While we concluded that the district court should have given a *Stanley* instruction along with the *Bernhardt* instruction on premeditation, we held that this omission was not clear error. And K.S.A. 22-3414(3) provides that a party cannot claim such issues as error and include them in a cumulative error analysis. See *State v. Waldschmidt*, 318 Kan. 633, Syl. ¶ 9, 546 P.3d 716 (2024).

## VI. *Romey must be resentenced due to an error calculating his criminal history.*

The typical punishment for a first-degree premeditated murder conviction is a life sentence with no opportunity for parole for 50 years—a hard 50 sentence. K.S.A. 21-6620(c)(1)(A); K.S.A. 21-6623. But the statutes include a qualification when a defendant's criminal-history score would yield a presumptive sentencing range exceeding 50 years for a severity level 1 crime. In that circumstance, the longer range becomes the mandatory-minimum term. K.S.A. 21-6620(c)(1)(B); K.S.A. 21-6623.

This qualification applied to Romey. His criminal-history score of A placed his presumptive sentencing range between 592 and 653 months for a severity level 1 crime. So the district court imposed a life sentence with no parole eligibility for 653 months— roughly 54.5 years—rather than the hard 50.

Romey now challenges that criminal-history score. Under K.S.A. 21-6809, defendants with "three or more adult convictions . . . for person felonies" have a criminal-history score of A. And K.S.A. 21-6811(a) provides that every three "person misdemeanors in the offender's criminal history . . . shall be rated as one adult conviction

18

. . . of a person felony for criminal history purposes." The district court found that Romey had six prior person felonies for criminal-history purposes. These included three Kansas criminal-threat convictions, a Kansas aggravated-battery conviction, an Oklahoma domestic-assault-and-battery conviction, and one person felony derived from three person-misdemeanor convictions.

Romey raises two challenges to his criminal-history score. We conclude that both have merit.

He first contends that the criminal-threat convictions cannot be counted because our court ruled in *State v. Boettger*, 310 Kan. 800, Syl. ¶ 3, 450 P.3d 805 (2019), that the portion of the statute criminalizing reckless threats was unconstitutional. Romey raised the issue at sentencing, so the State had the burden to prove that those convictions should be included in Romey's criminal history. See K.S.A. 21-6814(c). The State couldn't meet that burden. Under K.S.A. 21-6810(d)(9), "[p]rior convictions of a crime defined by a statute that has since been determined unconstitutional by an appellate court shall not be used for criminal history scoring purposes." For the same reasons we recently explained in *State v. Smith*, we agree with Romey and hold that his criminal-threat convictions were improperly included. 320 Kan. 62, 90-91, 563 P.3d 697 (2025).

Second, Romey argues that the district court erred by relying on his Louisiana misdemeanor conviction for violating a protection order. This was one of the three misdemeanor convictions that the district court converted into a person felony for sentencing purposes. See K.S.A. 21-6811(a). Without this Louisiana conviction, Romey would have had only two person-felony convictions, placing him in criminal-history category B instead of A. See K.S.A. 21-6809 (defining criminal-history classification B). Romey did not raise this challenge below, so he bears the burden of showing that the conviction should not have been counted. See K.S.A. 21-6814(d).

19

When Romey committed the present offense, Kansas law counted out-of-state misdemeanor convictions only when "comparable" to a Kansas crime. K.S.A. 21-6811(e)(2)(B). Comparability under the then-controlling *Wetrich* test required the out-of-state crime's elements to be identical to or narrower than those of a Kansas offense. *State v. Wetrich*, 307 Kan. 552, 562, 412 P.3d 984 (2018). Romey argues that the Louisiana law instead sweeps more broadly than the similar Kansas statute.

The Louisiana law Romey violated punishes "willful disobedience" of a criminal stay-away order under La. Stat. Ann. § 14:79(A)(1)(a). Such orders give courts discretion to, among other things, prohibit defendants from "contacting the victim in any manner whatsoever" as a condition of bail. La. Code Crim. Proc. Ann. Art. 335.1(A)(1). The potentially comparable Kansas statute prohibits "knowingly violating" pretrial release conditions that restrict "direct or indirect contact with another person." K.S.A. 21-5924(a)(4). But the Kansas law contains a crucial exception:  attorneys representing defendants may contact protected parties for legitimate purposes within the scope of the criminal proceeding. K.S.A. 21-5924(c). This exception has no Louisiana counterpart.

Romey contends that the Louisiana statute is broader because it can criminalize contacts by an attorney made at the defendant's direction. Under the "contacting the victim in any manner whatsoever" language, a defendant could violate the Louisiana statute by having their attorney contact the victim, even for legitimate representation purposes. Such conduct would fall within Kansas' attorney exception.

The State dismisses this scenario as a "fairytale" contradicting Louisiana law. It cites an opinion from the Louisiana Supreme Court that suggests Louisiana law "anticipates that counsel for the accused may ask a crime victim or complaining witness for an interview during the course of a criminal prosecution." *State v. Jones*, 306 So. 3d 432, 432 (La. 2020). But that language comes from a dissent to a denial of certiorari where a district court had explicitly prohibited defense counsel from contacting victims

20

during the criminal proceedings. *Jones*, 306 So. 3d at 432 (Johnson, C.J., dissenting from denial of cert). The court's decision to deny review left in place the Louisiana Circuit Court of Appeals' judgment validating these restrictions. This procedural history undermines the State's position.

In short, a Louisiana court could issue a no-contact order under its "any manner whatsoever" language that prohibits an attorney from contacting the protected party at the defendant's direction. Disobeying that order would violate the Louisiana statute but fall within Kansas' attorney exception. The elements of the Louisiana statute thus extend beyond Kansas' narrower prohibition, rendering Romey's Louisiana conviction noncomparable under *Wetrich*.

The district court should not have relied on Romey's criminal-threat convictions or his Louisiana misdemeanor conviction for violating a protection order to calculate Romey's criminal history. And without those convictions, the district court should not have sentenced Romey based on an A criminal-history score. We thus remand for resentencing.

VII.    *Romey's jail-credit issue is not properly before us.*

After oral argument, we granted Romey's request for supplemental briefing. Romey argued that he was entitled to additional jail credit under *Ervin*, which we decided the month before Romey's oral argument. *Ervin* held that defendants were entitled to one day of credit for each day incarcerated pending disposition of a case. This rule applied regardless of whether the defendant also received credit for some or all that time in other cases. *Ervin*, 320 Kan. 287, Syl. ¶ 12.

That's relevant here because Romey was held for several months on a parole-violation warrant while this case was pending. The sentence here ran consecutive to the

21

sentence in that case. The Kansas Department of Corrections credited the time to the parole-violation case only, not to the sentence in this case. Romey therefore received only 645 days of jail credit on his murder sentence instead of the full 818 days.

The Legislature has amended the jail-credit statute, but the version we considered in *Ervin* applies because it was in effect when Romey committed the murder. See *State v. Juiliano*, 315 Kan. 76, 80, 504 P.3d 399 (2022); K.S.A. 21-6615, as amended by L. 2024, ch. 96, §§ 7, 13. Romey asks for the same result as *Ervin*: remand to the district court to award the additional jail credit he is entitled to under the pre-amended statute. See *Ervin*, 320 Kan. at 311-312.

But Romey faces a significant procedural barrier. Romey first brought the issue to our attention in a motion filed shortly before oral argument. He then developed his arguments in the supplemental briefing we ordered. And generally, we will not consider arguments raised for the first time in a supplemental brief. See *Zaragoza v. Board of Johnson County Comm'rs*, 320 Kan. 691, 696, 571 P.3d 545 (2025).

Romey insists he can overcome this barrier under *State v. Williams*, 311 Kan. 88, 93-94, 456 P.3d 540 (2020). In *Williams*, the court decided *Wetrich* while Williams' appeal was pending. See 307 Kan. 552. Relying on *Wetrich*, Williams filed a supplemental brief raising an illegal-sentence claim about the classification of a prior out-of-state conviction for criminal-history purposes.

*Williams* held that the illegal-sentence challenge was properly before it for three reasons. *Williams*, 311 Kan. at 94. First, the court applied a Kansas Supreme Court Rule that permits the court to "address a plain error not presented" in a petition for review. See Supreme Court Rule 8.03(b)(6)(C)(i) (2025 Kan. S. Ct. R. at 56). Second, the court asserted that barring the claim would conflict with the illegal-sentence statute, which allowed the court to "correct an illegal sentence at any time." 311 Kan. at 94 (quoting

K.S.A. 2018 Supp. 22-3504[1]). Third, the court observed that changes in the law generally apply to cases still pending on direct review. 311 Kan. at 94 (citing *State v. Ford*, 302 Kan. 455, 471, 353 P.3d 1143 [2015]). But none of those rationales apply here.

First, Rule 8.03(b)(6)(C)(i) allows the court to "address a plain error not presented," but it applies only to cases where we grant discretionary review from the Court of Appeals, not on direct appeal from the district court. (2025 Kan. S. Ct. R. at 56). Perhaps, as Romey contends, there is no good policy rationale for limiting plain-error review of unpreserved issues to petitions for review. But the rule's text clearly addresses petitions for review. And we have not invoked the plain-error exception outside that context.

Second, although we may "correct an illegal sentence at any time while the defendant is serving such sentence," Romey has not raised an illegal-sentence claim. K.S.A. 22-3504(a). And our caselaw has not definitively settled whether jail-credit challenges fall within the illegal-sentence statute. Compare *State v. Lofton*, 272 Kan. 216, 32 P.3d 711 (2001) (claim that jail credit improperly computed is not an illegal-sentence claim), with *State v. Harper*, 275 Kan. 888, 69 P.3d 1105 (2003) (reversing denial of illegal-sentence motion when district court improperly allocated jail credit). Two dissenting justices would hold that jail-credit challenges are illegal-sentence claims. They reason that a sentence with improperly calculated credits fails to "'conform to the applicable statutory provision'"—the jail-credit statute. *State v. Romey*, 321 Kan. ___, ___, slip op. at 32; see K.S.A. 22-3504(c)(1); K.S.A. 21-6615(a). And another member of our court has suggested that we should clarify the issue. See *State v. Smith*, 309 Kan. 977, 990, 441 P.3d 1041 (2019) (Luckert, J., concurring in part and dissenting in part). Perhaps a sentence with improperly calculated jail credits is illegal because it fails to "conform to the applicable statutory provision"—the jail-credit statute. K.S.A. 22-3504(c)(1); K.S.A. 21-6615(a).

23

The dissent may well be right that this claim falls within the illegal-sentence statute. But Romey has made no such argument. He did not address the potentially conflicting illegal-sentence caselaw. He did not cite the illegal-sentence statute. The dissent would reach the issue anyway under our discretionary authority to raise issues sua sponte. See *State v. Valdez*, 316 Kan. 1, Syl. ¶ 5, 512 P.3d 1125 (2022). We decline to exercise that authority here. Neither party has argued that incorrect jail-credit calculations render sentences illegal. And that discretionary authority requires notice and opportunity to address the issue. The parties have had neither.

Third, the change in the law was *State v. Hopkins*, 317 Kan. 652, 537 P.3d 845 (2023), not *Ervin*. *Hopkins* departed from the traditional interpretation of the jail-credit statute. Under the old rule, courts awarded credit for time spent in custody "solely" on the charge the defendant was being sentenced for. A defendant was not entitled to credit for time "'which he has spent in jail upon other, distinct, and wholly unrelated charges.'" *Hopkins*, 317 Kan. at 655. But *Hopkins* departed from this interpretation. We held that the plain language of the statute instead required courts to award a defendant credit for "*all* time spent in custody pending the disposition of his or her case," regardless of whether the defendant "had other cases pending against him while he was in jail." 317 Kan. at 657, 659.

Although *Hopkins* involved a defendant sentenced in only one case, we didn't "limit the holding to sentences involving single cases or concurrent sentences." *Ervin*, 320 Kan. at 308. So in *Ervin*, we applied the *Hopkins* interpretation to a different scenario—when a defendant receives consecutive sentences in separate cases. Under the old rule, a defendant would have been prohibited from receiving jail credit against the sentences in both cases. But under *Hopkins*' new interpretation, a "sentencing judge should thus allow credit for all days incarcerated on a case, regardless of whether the

24

defendant received a credit for some or all that time against a sentence in another case." *Ervin*, 320 Kan. 287, Syl. ¶ 12. So although Romey characterizes *Ervin* as a change in the law, it simply applied *Hopkins*, the case that changed the law.

We decided *Hopkins* before Romey was sentenced in the district court. So he knew or should have known about the change in the law supporting his jail-credit challenge well before appellate briefing. No clairvoyance was needed, as the dissent suggests. Before briefing, several Court of Appeals panels had also considered how *Hopkins* applied in cases with consecutive sentences in multiple cases. See, e.g., *State v. Feikert*, 64 Kan. App. 2d 503, 505, 553 P.3d 344 (2024); *State v. Gutierrez*, No. 125,073, 2024 WL 1338948 (Kan. App. 2024) (Malone, J., concurring) (unpublished opinion); *State v. Breese*, No. 125,837, 2023 WL 8520792 (Kan. App. 2023) (unpublished opinion); *State v. Ward*, No. 125,421, 2023 WL 7404186 (Kan. App. 2023) (unpublished opinion). And the defendant in *Ervin* cited some of these authorities to argue that *Hopkins* required the court to award duplicative credit in his cases. Indeed, the facts of *Breese* mirror Romey's. The panel decided the case before Romey's sentencing. And even without *Ervin*, the panel concluded that applying *Hopkins* to consecutive sentences in different cases "leads to an obvious result." *Breese*, 2023 WL 8520792, at *3.

In sum, we disagree with Romey that *Williams* allows us to reach the jail-credit issue that he first raised and developed in supplemental briefing. We therefore conclude that the issue is not properly before us.

But that does not leave Romey without recourse. We are vacating his sentence because his criminal-history score was incorrectly calculated, and we are remanding for resentencing. In some cases, where only part of the sentence is vacated and there is nothing for the district court to decide, remand for new sentencing proceedings is unnecessary. See *State v. Brown*, 320 Kan. 426, 433, 569 P.3d 909 (2025) (remand unnecessary where journal entry aligned with appellate mandate and reflected sentence

25

required by law). But when the entire sentence is vacated, as here, sentencing "essentially starts anew" and the district court has jurisdiction to consider sentencing issues under the applicable statutes. See *State v. McMillan*, 319 Kan. 239, 256, 258, 553 P.3d 296 (2024) (when entire sentence vacated, district court shall consider "any departure or other motion, the parties' arguments, and relevant provisions of the KSGA"). The district court may address issues necessary to dispose of the case that were left open by the appellate mandate. *State v. Soto*, 310 Kan. 242, 256, 445 P.3d 1161 (2019). We have not ruled on the merits of Romey's jail-credit claim—we found only that it was not preserved for this appeal. The issue thus remains "untouched by appellate proceedings." 310 Kan. at 256. And the district court will need to address jail credit because it must select a sentence start date. See K.S.A. 21-6615(a)(1). So Romey's jail-credit challenge falls within the scope of our remand mandate.

Given this remand, the dissent's accusation that we "perpetuate injustice" by keeping Romey imprisoned longer than the law requires rings hollow. *Romey*, 321 Kan. at ___, slip op. at 33. The district court will calculate jail credit correctly under settled law. Nor do we hold "as a matter of law that this court cannot reach the merits of Romey's jail-credit claim." 321 Kan. at ___, slip op. at 28. We acknowledge our inherent authority but decline to exercise it under these facts. Romey never raised the issue despite existing authority. His claim falls outside *Williams*. He has not made an illegal-sentence argument. And remand will provide an opportunity for complete relief. Fundamental fairness does not require us to bypass our normal preservation rules when the district court can and will address the issue.

Conviction affirmed, sentence vacated, and case remanded with directions.

WILSON, J., not participating.

26

*  *  *

STEGALL, J., concurring:  I agree with the dissent that our rules can never prevent this court from exercising its inherent discretionary authority to consider an issue that was not properly preserved or presented on appeal—a point the majority itself seems to acknowledge. But in this case, I concur with the majority's exercise of that discretion.

*  *  *

STANDRIDGE, J., dissenting:  I respectfully dissent from the majority's conclusion that Kyle Romey's jail-credit claim under *State v. Ervin*, 320 Kan. 287, 566 P.3d 481 (2025), is not properly before this court.

On this issue, the majority holds

- Romey's jail-credit issue is *not preserved* because it was raised for the first time in supplemental briefing after oral argument. See slip op. at 22.

- *Ervin* was not a change in law; it merely applied *State v. Hopkins*, 317 Kan. 652, 537 P.3d 845 (2023), which was decided before Romey's sentencing. Therefore, Romey "knew or should have known" to raise the issue earlier. See slip op. at 25.

- *State v. Williams*, 311 Kan. 88, 93-94, 456 P.3d 540 (2020), does not authorize review here because it applies only to petitions for review and illegal-sentence claims. See slip op. at 22-23.

27

Although holding as a matter of law that this court cannot reach the merits of Romey's jail-credit claim, the majority notes that the district court is not precluded from considering the issue on remand because Romey's entire sentence is being vacated for resentencing, which starts the sentencing process anew.

In my view, the majority errs twice.

First, the court minimizes *Ervin* by characterizing it as a mere application of *Hopkins*, and then faulting Romey for failing to anticipate *Ervin*'s extension of *Hopkins* to consecutive sentences. Second, the majority applies our preservation rules with unnecessary rigidity, refusing to exercise the court's inherent or sua sponte authority to prevent a manifest injustice that results in a defendant serving more time than the law permits.

ANALYSIS

1. Ervin *materially changed the law governing jail credit.*

The majority says *Ervin* "simply applied" *Hopkins* and thus did not change the law. Slip op. at 25. Based on my review of *Hopkins* and *Ervin*, I disagree.

In 2020, the State charged Hopkins with murdering two people in Cherokee County. While he was in jail on the murder charges, the State filed a motion to revoke probation in a prior theft case from 2018. In 2021, Hopkins escaped from jail and remained at large for four days before being captured. Upon his return to jail, the State filed two new charges against Hopkins relating to the escape from custody.

Hopkins eventually entered into a plea agreement with the State. He agreed to plead guilty to two counts of premeditated first-degree murder, and the State agreed to

28

withdraw the pending motion to revoke probation in the theft case; dismiss the escape charges in Cherokee County; and dismiss an additional pending Labette County case. At sentencing, the State argued Hopkins was not entitled to any credit for the 572 days he spent in jail because he was not being held "solely" on the murder charge for which he was being sentenced. In support, the State noted Hopkins was also in jail on the motion to revoke probation, the theft case, and the Labette County case. The district court agreed, relying on the rule in *Campbell v. State*, 223 Kan. 528, 528-31, 575 P.2d 524 (1978), which stated that an award of jail-time credit is limited to time spent "solely" in custody for the charge for which the defendant is being sentenced under K.S.A. 21-6615(a).

On review, this court reversed the district court's decision, holding that the *Campbell* "solely on account of" rule was inconsistent with the plain language of K.S.A. 21-6615(a). This court emphasized that the statute requires credit for "the time which the defendant has spent incarcerated pending the disposition of the defendant's case," without limiting that credit to periods when the defendant was held only on the sentencing charge. *Hopkins*, 317 Kan. at 656. Because the statute's text did not include a "solely" restriction, this court concluded that the district court erred by denying Hopkins credit for the 572 days he spent in jail while the murder case was pending. 317 Kan. at 659. In so holding, this court overruled *Campbell* and its progeny to the extent that these cases imposed an additional limitation not found in the statute and remanded the case for the district court to award Hopkins full jail-time credit.

The majority's contention that *Ervin* merely applied the holding in *Hopkins* overlooks the doctrinal expansion that *Ervin* represents. While *Hopkins* addressed the meaning of K.S.A. 21-6615(a) in the context of a single pending case, *Ervin* extended that reasoning to a distinct and previously unresolved question—how jail-time credit must be applied when a defendant faces multiple cases resulting in consecutive sentences.

29

In *Hopkins*, the court's focus was narrow but foundational: it rejected the long-standing "solely on account of" limitation derived from *Campbell*, holding that the plain text of K.S.A. 21-6615(a) entitles a defendant to credit for "*all* time spent in custody pending the disposition of his or her case," even if other cases or holds were simultaneously in effect. *Hopkins*, 317 Kan. at 657-59. *Hopkins* therefore clarified who is entitled to credit and when that entitlement accrues, but it did not address how such credit operates across multiple sentences.

Although *Hopkins* expressly overruled several prior cases that had adopted or applied the "solely on account of" limitation from *Campbell*, it did not list *State v. Lofton*, 272 Kan. 216, 32 P.3d 711 (2001), and *State v. Davis*, 312 Kan. 259, 474 P.3d 722 (2020), among those decisions. Both *Lofton* and *Davis* had reaffirmed the rule that jail-time credit cannot be duplicated across consecutive sentences. Because *Hopkins* involved only a single case, its holding left those consecutive-sentence precedents formally undisturbed. It was *Ervin* that directly confronted that issue and, by holding that credit must be awarded in each case pending during the defendant's confinement—even if that results in overlapping credit—*Ervin* effectively displaced *Lofton* and *Davis*. In doing so, *Ervin* accomplished what *Hopkins* did not: it extended the plain-language interpretation of K.S.A. 21-6615(a) to the consecutive-sentence context and thereby overruled those earlier cases in substance, if not by name.

*Ervin* thus took the next step in this court's evolving interpretation of K.S.A. 21-6615(a). The defendant there faced consecutive sentences in separate cases, and the district court awarded jail-time credit only once, declining to duplicate credit across those cases. This court held that was error, reasoning that the same statutory language construed in *Hopkins*—"the time which the defendant has spent incarcerated pending the disposition of the defendant's case"—requires credit in each case that was pending during the defendant's confinement, even if that produces overlapping credit. 320 Kan. at 310-12.

30

Accordingly, while *Hopkins* eliminated the "solely" restriction, *Ervin* expanded that reasoning to the application of jail credit in consecutive-sentence contexts, confirming that the statute's plain-language entitlement applies independently to each case. This clarification meaningfully altered Kansas law by transforming the rule from one governing single-case credit eligibility into one that mandates duplicative credit across multiple cases, where previously such duplication was barred. Thus, *Ervin* did not simply apply *Hopkins*; it extended and completed the interpretive shift that *Hopkins* began—thereby broadening the reach of K.S.A. 21-6615(a) from the single-case context to the full range of cases resulting in consecutive sentences.

Romey could not have reasonably anticipated *Ervin* when briefing closed. To insist he "should have known" to predict a doctrinal extension that our court itself had not yet made is to demand prescience, not diligence.

2.  *The preservation rule should yield to the court's duty to correct manifest injustice.*

Even if Romey first raised his claim in supplemental briefing, this court retains ample authority to decide it.

a.  *Our rules and precedent permit discretionary review of unpreserved issues.*

Kansas Supreme Court Rule 8.03(b)(6)(C)(i) authorizes this court to "address a plain error not presented" to the Court of Appeals or in a petition for review. (2024 Kan. S. Ct. R. at 56). Though the majority confines that rule to petitions for review, our precedent recognizes broader inherent power to reach unpreserved issues "'to serve the ends of justice or to prevent the denial of fundamental rights.'" *State v. Hilyard*, 316 Kan. 326, 343, 515 P.3d 267 (2022) (exercising discretion to consider unpreserved issue because it implicates a fundamental right); *Williams*, 311 Kan. at 93-94 (exercising

31

discretion to consider unpreserved sentencing issue because "[s]ubjecting a defendant to a longer sentence without a legal basis would be a miscarriage of justice"). Indeed, we have gone so far as to raise issues sua sponte when we determine the resolution of the case demands it. See *State v. Parry*, 305 Kan. 1189, 1192, 390 P.3d 879 (2017) ("[B]ecause preservation is a prudential rule, rather than a jurisdictional bar, we have also held that an appellate court has discretion to apply exceptions to that general rule . . . includ[ing] the *sua sponte* reaching of an issue not raised below or on appeal by either party.").

This case fits squarely within that tradition. The court itself invited supplemental briefing after granting Romey's motion, thereby satisfying any due-process concern. The parties fully briefed and argued the issue. There is no unfair surprise to the State, only an insistence on procedural rigidity at the expense of substantive justice.

b. *A miscalculated jail credit implicates the legality of a sentence.*

The majority notes uncertainty over whether an erroneous jail-credit calculation renders a sentence "illegal" under K.S.A. 22-3504(a). We should resolve that question here. A sentence that fails to "conform to the applicable statutory provision," K.S.A. 22-3504(c)(1), is illegal. *State v. Lee*, 304 Kan. 416, 417-18, 372 P.3d 415 (2016). The jail-credit statute, K.S.A. 21-6615(a), is mandatory: the district court "shall credit" the defendant for all time spent in custody pending disposition of the case. If a sentence omits statutorily required credit, it fails to conform to the statute and is therefore illegal. See *State v. Harper*, 275 Kan. 888, 890-91, 69 P.3d 1105 (2003) (reviewing alleged jail-credit miscalculation as illegal-sentence claim).

Recognizing such errors as illegal sentences would harmonize our treatment of analogous situations. We routinely correct sentencing errors sua sponte because such errors make the sentence illegal. See, e.g., *State v. Zongker*, 319 Kan. 411, 437-38, 555 P.3d 698 (2024) (citing *State v. Johnson*, 309 Kan. 992, 997, 441 P.3d 1036 [2019]); *State*

*v. Ballou*, 310 Kan. 591, 617, 448 P.3d 479 (2019) (citing K.S.A. 22-3504; *Johnson*, 309 Kan. at 997; *State v. Rogers*, 297 Kan. 83, 93, 298 P.3d 325 [2013]). There is no principled reason to treat an unlawfully reduced jail-credit award differently.

3. *Fundamental fairness demands correction here.*

The majority all but acknowledges that, had we reached the merits, Romey would win under *Hopkins*/*Ervin*. Yet it declines to remedy that acknowledged error. The result is that Romey remains imprisoned for time the Legislature says he has already served. That outcome cannot be squared with our "statutory duty to correct an illegal sentence at any time." *State v. Juiliano*, 315 Kan. 76, 79, 504 P.3d 399 (2022).

Preservation rules are meant to promote fairness, not to perpetuate injustice. When procedural regularity collides with fundamental liberty interests, justice, not technicality, must prevail.

CONCLUSION

Because *Ervin* changed Kansas law in a material way, and because this court possesses both the authority and the obligation to correct a manifestly unjust sentence, I would reach the merits of Romey's jail-credit claim and remand with directions to award credit consistent with *Ervin* and K.S.A. 21-6615(a). For these reasons, I respectfully dissent.

ROSEN, J., joins the foregoing dissenting opinion.

33